ROGER MASON *v.* STATE OF MARYLAND

[No. 429, September Term, 1970.]

*Decided August 11, 1971.*

656

The cause was argued before ORTH, THOMPSON and MOYLAN, JJ.

*Thomas A. Lohm* for appellant.

*James F. Truitt, Jr., Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, William A. Linthicum, Jr., State's Attorney for Montgomery County, Walter H. Madden* and *John M. King, Assistant State's Attorneys for Montgomery County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

On January 14, 1970, combined law enforcement teams representing five separate agencies—including the Maryland State Police, the Montgomery County Police and the United States Bureau of Narcotics and Dangerous Drugs —culminated six months of investigation, covering the states of Maryland, Delaware, Pennsylvania and the District of Columbia, into the wholesale manufacturing and distribution of hallucinogenic drugs. Search warrants were on that day simultaneously executed on two Montgomery County residences, one "health food" store in Montgomery County, another "health food" store in the District of Columbia, an automobile in Montgomery County and a farm in Easton, Maryland. Confiscated were significant amounts of marijuana, hashish, opium and LSD, as well as large amounts of another hallucinogenic drug known as "PCP." Also confiscated was equipment for the processing of drugs. Recovered as well were chemicals which had a potential yield of 250,000 doses of "PCP," 20,000,000 doses of LSD and 3,000,000 doses of another hallucinogenic drug known as MDA.

As a result of these raids, on February 4, 1970, a series of indictments were returned against the appellant, Roger Mason, by the Grand Jury for Montgomery County. Five of those, over his objection, were consolidated for trial. The eight-day trial before a jury, presided over by Judge Ralph G. Shure, began on Monday, May 25, 1970, and concluded on Thursday, June 4, 1970.

On Indictment No. 10827, the jury found the appellant guilty of possession of opium. On Indictment No. 10828, the jury found him guilty of possession of hashish. On

Indictment No. 10829, the jury found him guilty of possession of marijuana. On Indictment No. 10830, the jury found him guilty of possession of LSD. On Indictment No. 10832, the jury found him guilty of unlawfully manufacturing, compounding and processing an hallucinogenic drug, commonly known as "PCP." Under the second count of the same indictment, the appellant was found guilty of conspiring with David Macklar and Allison C. Land to manufacture, compound and process "PCP."

On Indictment No. 10827, the appellant was sentenced to two years imprisonment and a fine of $200, the sentence to run consecutively with that he received on Indictment No. 10832. On Indictment No. 10828, the appellant was sentenced to one year imprisonment and a fine of $200, the sentence to run consecutively with the sentences received on Indictment Nos. 10832 and 10827. On Indictment No. 10829, the appellant was given a generally suspended sentence. On Indictment No. 10830, the appellant was sentenced to one year imprisonment and a fine of $100, the sentence to be served consecutively with those received on Indictment Nos. 10832, 10827 and 10828. On Indictment No. 10832, the appellant was sentenced to a term of five years imprisonment and a fine of $5,000 on the first count and to a term of four years imprisonment on the second count, the two sentences to run consecutively with each other.

Upon this appeal, the appellant raises a grand total of fourteen contentions.

### Lack of Instruction on Accomplice's Testimony

One of the State's witnesses in this case was James D. Macklar, who was named as a co-conspirator with the appellant in Indictment No. 10832. There is no question but that Macklar was, in fact, an accomplice to the appellant, with respect to Indictment No. 10832. The appellant requested an instruction to the effect that the testimony of Macklar, as an accomplice, "should be reviewed with suspicion and must be corroborated." Judge Shure

declined to give such an instruction with the following statement:

> "I don't see how we can call this a circumstantial evidence case at all when we have the evidence that is in this case, nearly 300 exhibits. All of the matter that was found and what have been in his home and where he had been placed in his place of business where he was apprehended. I don't think this requires me to go into what we would in some cases with the uncorroborated testimony of an accomplice, because there is much corroboration in this case. I don't follow you on that."

It is true that it is incumbent upon the court, when requested in a criminal case, to give an advisory instruction on every essential question or point of law supported by the evidence. *Gaskins v. State,* 7 Md. App. 99, 105; *Halcomb v. State,* 6 Md. App. 32; *Gordon v. State,* 5 Md. App. 102; *Malloy v. State,* 4 Md. App. 420; *Huber v. State,* 2 Md. App. 245; *Tipton v. State,* 1 Md. App. 556; Maryland Rule 756b.

In declining to give the instruction, the trial court apparently relied upon another well-settled principle of law that a request for an instruction is properly refused where there is no evidence to support it. *Duffin v. State,* 229 Md. 434; *Wiley v. State,* 237 Md. 560. A proper application of that principle would be, we feel, restricted to a situation where there is no supporting evidence that a witness is an accomplice. The principle was not, we feel, intended to be applied to a situation where the witness was arguably, let alone clearly, an accomplice but where there was no supporting evidence that the testimony of that witness was uncorroborated. The appellant was entitled to the instruction, particularly because it had some significance with respect to the credibility of the accomplice-witness and the resultant weight of his testimony, above and beyond the question of corroboration.

There remains to be considered, however, the question of whether this omission constituted reversible error or whether it may, in the context of this particular case, be deemed harmless error.

The language of both *Hardison v. State,* 226 Md. 53, and *Gaskins v. State, supra,* is broad enough to make the appellant's contention here arguable. In both of those cases, convictions were reversed for failure to give requested instructions on the skepticism with which accomplice testimony should be viewed. Because the literal holdings of those cases, however, arose out of narrow factual contexts not even remotely analogous to that before us here, we feel that neither *Hardison* nor *Gaskins* is dispositive of the case at bar. They teach us, to be sure, that the instruction should have been given. They did not deal with circumstances wherein harmless error *vel non* was the issue to be determined.

In both *Hardison* and *Gaskins,* the allegedy accomplice testimony represented the almost exclusive evidence of guilt. Those cases inevitably stood or fell upon the view taken by the jury of the testimony of the possible accomplice. Such is not, however, the situation at bar. The testimony of Macklar was a relatively minor factor in the massive accumulation by the State of inculpatory evidence.

The premises at 312 Willington Drive in Silver Spring was owned and occupied by the mother and father of the appellant. The appellant had been living there until some months before his arrest. There was testimony that the appellant secreted some of his contraband above the heat ducts in the basement of his parents' home. The police recovered from that area significant amounts of marijuana, hashish, LSD and opium.

The appellant was the lessee of the property at 7214 Carroll Avenue in Takoma Park which he operated as Nature's Restaurant. The police there found no evidence of an operating restaurant but did find large numbers of chemicals, chemical books, chemical equipment and chemical formulae.

One Gregory Jelly testified that he made his living selling drugs for the appellant and that on one occasion he had observed the appellant deliver 1,000 PCP tablets to one Vicki Ford. Vicki Ford testified that she sold PCP for the appellant, that on occasion she helped him prepare PCP, that she had seen him conceal "dope" above the heating ducts at 312 Willington Drive and that she had gone with him to the National Library of Medicine to help him find hallucinogenic formulae. She further testified that the chemical processing equipment located at 13023 Turkey Branch Parkway, a residence occupied by James David Macklar and Allison Land, was owned by and used by the appellant for the manufacturing of PCP.

The police recovered from 13023 Turkey Branch Parkway numerous chemicals and chemical equipment which represented over 200 exhibits at the trial.

An employee of the Arthur H. Thomas Pharmaceutical Company of Philadelphia, Pennsylvania, testified that the appellant, under the assumed name of R. M. Wallace, purchased chemicals from that company on five or six occasions between July 11, 1966, and November 28, 1969. The appellant was ostensibly purchasing these chemicals in the name of Biotechnical Products. The total sales came to $1,088. All transactions were in cash. The manager of North Strong, Inc., a chemical distributing firm in Rockville, identified the appellant as a frequent purchaser of chemicals from her company. She testified that he purchased the chemicals under the name of R. M. Wallace.

The general manager of the Wilmington Telephone Answering Service testified that the appellant was a subscriber to her company's telephone answering and mail service. He there used the name of Charles Harris. The company to which mail was sent for him was the Wilmington Research Company. She testified that the appellant picked up from her at her office many boxes and drums.

Numerous letters were admitted into evidence which

were addressed to the appellant from all over the country. Many were addressed to him as a "Dr. Wallace" from learned writers in the field of LSD and related drugs.

Theodore Hondoga, a special agent for the Federal Bureau of Narcotics and Dangerous Drugs, testified that on three occasions he made discreet observations of the appellant picking up packages from the Arthur H. Thomas Company in Philadelphia. Thomas King, another special agent for the Federal Bureau of Narcotics and Dangerous Drugs, testified that on four occasions he observed the appellant picking up packages at the Arthur H. Thomas Company in Philadelphia.

Richard Fox, a forensic chemist for the Federal Bureau of Narcotics and Dangerous Drugs, testified to the fact that the items recovered from 312 Willington Drive were marijuana, hashish, opium and LSD. He also testified that recovered from 13023 Turkey Branch Parkway were large amounts of PCP, some hashish, some LSD, as well as equipment for the manufacturing of PCP. He also testified that recovered at that address was a formula for the manufacture of LSD and a formula for the manufacture of PCP and MDA.

The appellant himself admitted on the stand that he had a thorough knowledge of chemistry. He admitted that he had made PCP at one time. He admitted that he checked the Federal Register every week and that he compiled extensive literature on all phases of psilocybin drugs (mind-altering drugs). The appellant testified that he established a dummy corporation, Biotechnical Products, to enable him to do corporately what he could not do individually, i.e., purchase chemicals and obtain research papers. The appellant also admitted that he was in the business of mailing LSD formulae to anyone who wished them for $1.

In view of this massive evidence of the appellant's guilt, there is no question but that the testimony of Macklar was amply corroborated many times over. In view of the proportionately small factor which Macklar's testimony represented in the over-all equation of

guilt, we hold that the omitted instruction, as to the light in which that purely cumulative testimony should be viewed, was, in the totality of this case, harmless error.

### Instruction on Marijuana Control

Chapter 237 of the Acts of 1970 passed the General Assembly as an emergency measure and, as a result, became effective on April 15, 1970. Section 2 of that Act provided that it "shall apply to any proceedings not finally adjudicated on the effective date of the Act." The trial in this case was held from May 25, 1970, to June 4, 1970. The provisions of the emergency measure, therefore, apply to this case. See *Oberlin v. State,* 9 Md. App. 426; *Nutt v. State,* 9 Md. App. 501.

Prior to April 15, 1970, marijuana was included within the definition of a "narcotic" drug by Article 27, Section 276. Section 277 made it a crime, *inter alia,* "to possess" and "to have under [one's] control" any "narcotic" drug as defined by Section 276. Section 300 then pronounced all violations of Section 277 to be felonies and prescribed the maximum penalty for a first offense as a fine of not more than $1,000 and/or imprisonment for not more than five years.

The emergency measure, operative as of April 15, 1970, amended Article 27, Section 300, so as to do away with all punishments for conduct under Section 277 in which marijuana was involved. Having wiped the slate clean, it then proceeded to provide a new penalty for conduct proscribed by Section 277 where marijuana was involved. It made the penalty for a first offense a maximum fine of $1,000 and/or imprisonment of one year. It also reduced the grade of the crime of possession of marijuana from felony to misdemeanor.

Significantly for present purposes, it spelled out that what was thereafter proscribed were violations of Section 277 "with regard to the possession or use" of marijuana, Section 300 (b), and "with regard to the sale, dispensing, giving away, or otherwise disposing" of marijuana, Section 300 (c). The Act did not expressly pre-

scribe a penalty for having marijuana "under control." The question then presented itself: Was "control" of marijuana still a felony under the old provision of Section 277 as not having been superseded by a replacement provision? or, alternatively, Was "control" of marijuana no longer a crime by virtue of not having a penalty provided for it? We held in *Nutt v. State, supra,* that the notion of "control" was comprehended within the broad definition of "possession," which includes as "constructive possession" anything which under the older cases could have been deemed "control." As a result, the mitigating features of the emergency measure applied to conduct which could be deemed "control of marijuana." All marijuana-related unlawful behavior, other than selling, dispensing, or giving marijuana away, was, therefore, reduced from felony to misdemeanor status.

The court below gave, nevertheless, the following instruction, to which the appellant then took and now takes exception:

> "Possession of marijuana is no longer a felony. It is, however, still a felony to have marijuana under your control as distinguished from possession."

The State concedes that this excerpted portion of the instruction was error under *Nutt v. State, supra,* but contends that it was harmless error. We agree. In the first place, the jury returned a verdict of guilty under Indictment No. 10829 only for the possession of marijuana, not for the control of marijuana. A similar verdict was returned on Indictment No. 10828 with respect to possession of hashish, not for control of hashish. In any event, the reference to control of marijuana as a felony, rather than as a misdemeanor, was not, we feel, on the facts of this case, in any way prejudicial to the appellant. The appellant does not even speculate as to what conceivably harmful effect might have resulted from this brief and fleeting, albeit erroneous, reference to the grade of a crime at the conclusion of eight long days of testi-

mony and argument. We will not fantasize as to prejudice where clearly none exists, lest no long, hard-fought and complicated case should ever be final.

### Jury Instructions

The third contention of the appellant, catalogued but not argued either upon brief or before this Court, is a scatter-shot attack upon the adequacy of the trial judge's instructions for nine separate reasons. The fusillade of alleged errors was aimed at omission—the not following faithfully of the lengthy prayer for instructions submitted by him. Our review is animated by the spirit of *Shotkosky v. State,* 8 Md. App. 492, and *Graef v. State,* 1 Md. App. 161, that the instructions to be analyzed be "taken as a whole" and that, on any point of law, no special words of art are indispensable as shibboleth or talisman, just so long as the instruction given captures the fair essence of the point to be conveyed.

The appellant complains that the judge (1) did not instruct adequately on the presumption of innocence. Upon our review of the instruction, we think the subject was fairly and adequately covered. Moreover, the appellant did not, at the conclusion of the judge's instruction, register his objection to any alleged omission. Maryland Rules 1085 and 756 g.

The appellant complains that the judge (2) did not adequately define the terms "manufacture, compound or process" and further that he (3) did not adequately define "phencyclidine." Again, we feel that the judge adequately covered the subject matter. Again, the appellant did not register his objections. Maryland Rules 1085 and 756 g.

The appellant complains that the judge (4) did not adequately instruct on the subject of accomplice testimony. The appellant here reiterates as a subcontention of his third major contention that point which he has already listed as his first major contention. Our discussion of the point when raised hereinbefore is dispositive of its reiteration now.

The appellant complains that the judge (5) did not instruct the jury that "when guilt is based solely upon circumstantial evidence, the circumstances taken together must be inconsistent with, or such as to exclude, every reasonable hypothesis or theory of innocence." He relies on *Vincent v. State,* 220 Md. 232, and *Shelton v. State,* 198 Md. 405, 412. He reads *Vincent* and *Shelton* overbroadly. In the Memorandum on Motion for Reargument in *Edwards v. State,* 198 Md. 132; *Brown v. State,* 222 Md. 290, 296; and *Glaros v. State,* 223 Md. 272, 281, the Court of Appeals made it clear that the emphasis in that at-first-glance-sweeping language from *Vincent* and *Shelton* should properly be upon the words "solely" and "reasonable." See the excellent discussion of the appropriate appraisal to be made of circumstantial evidence by Judge Orth in *Nichols v. State,* 5 Md. App. 340, 348-353. In the case at bar, it is clear that the evidence against the appellant was not solely circumstantial and that the instruction he requested was, therefore, not predicated upon an appropriate factual foundation. It was properly denied. *Wiley v. State,* 237 Md. 560; *Duffin v. State,* 229 Md. 434; *Bruce v. State,* 218 Md. 87. See, however, *Metz v. State,* 9 Md. App. 15.

The appellant complains that the judge (6) did not instruct the jury adequately on the subject of fingerprint evidence. At the conclusion of the court's instructions, the appellant registered no objection in this regard and there is, therefore, nothing before us for review. Maryland Rules 1085 and 756 g.

The appellant complains that the judge (7) did not adequately instruct the jury as to the necessity of finding co-conspirators guilty in order to find the appellant guilty of the crime of conspiracy. Judge Shure initially instructed in this regard:

> "In the second Count you must find that he conspired with Macklar or Land or at least one of them in order to be guilty of the conspiracy. The crime of conspiracy to manufacture is a misdemeanor. Conspiracy is a combination of

two or more persons to accomplish a criminal or unlawful act or to do an unlawful act by criminal or unlawful means. Conspiracy is the unlawful combination, and no further overt act is required to constitute conspiracy."

He later issued the following supplementary instruction:

"On the crime of conspiracy, it, of course, requires a specific intent and necessarily involves at least two guilty parties, if you have three, you must find in addition to the Defendant one of the other two is also guilty and a required criminal intent must exist in the mind of the two or more parties to the conspiracy."

We believe this to have been a fair and adequate statement of appropriate law. *Regle v. State,* 9 Md. App. 346.

The appellant complains that the judge (8) did not adequately instruct the jury on the subject of "bias of a witness." Neither in his brief nor in oral argument does he give any indication of what he means by this contention. Suffice it to say that he registered no objection and the point, whatever it means, is not preserved for review. Maryland Rules 1085 and 756 g.

The appellant finally complains that the judge (9) committed error in declining to instruct the jury that, in January, 1970, the manufacture of the drug known as JB 336 and the drug known as MDA was not a crime and did not become a crime until several weeks before the trial of the appellant's case. The trial court had given the following instruction:

"There has been much testimony of other types of drugs that the State contends through witnesses this Defendant was engaged in manufacturing or attempting to manufacture. The reason that I permitted that evidence to go in, that is that these other drugs that you will remember there was some testimony about, the rule is that evidence of other crimes is admissi-

ble to prove a specific crime charged when such other evidence tends to be motive, or intent or absence of any mistake or act or a common plan or scheme to prove the identity of the person with the commission of a crime on trial. That is why I permitted testimony with respect to these other drugs."

The evidence that appellant manufactured JB 336 and MDA was properly admissible to show his familiarity and expertise in this field, and as tending to establish a plan or scheme on his part to engage in the manufacture of drugs. Under these circumstances, the fact that the trial judge improperly characterized the manufacture of such drugs as a crime would not constitute reversible error.

### The Fine under Indictment 10832

The State concedes that under Section 313B of Article 27, the maximum fine which could have been imposed was $2,000 and that the $5,000 fine imposed upon the appellant under the first count of Indictment 10832 was excessive.[1] Accordingly, we will remand for a correction of the sentence.

### Consolidation of Indictments for Trial

The appellant objects to the consolidation for trial of the five indictments against him. Maryland Rule 734 provides:

"The court may order two or more indictments to be tried together if the offenses and the defendants, if there be more than one, could have been joined in a single indictment."

In *McLaughlin v. State*, 3 Md. App. 515, this Court explained the purpose of Maryland Rule 734:

---

1. A new penalty provision, setting the maximum fine for a first offense at $2,000, was enacted by Chapter 734 of the Acts of 1970 as an emergency measure and, therefore, applied to all sentences handed down after May 21, 1970, the effective date of the Act. The appellant was sentenced on July 1, 1970.

"The purpose [of Md. Rule 734] is to save the time and expense of separate trials under the circumstances named in the Rule, if the trial court, in its discretion, deems a joint trial proper." P. 522.

The appellant could have been charged in separate counts of a single indictment with all of the offenses here set out in the five indictments under review. Maryland Rule 716 a. All of the offenses involve substantially the same facts. They all occurred at about the same time and at the same general place. The physical evidence in all cases was a product of the simultaneous execution on January 14, 1970, of search warrants based on a common statement of probable cause. The State would have been compelled to produce essentially the same group of witnesses to prove each of the charges individually. The offenses here are of the same general nature, form part of the same general scheme of unlawful conduct, and permit the same mode of trial. Their joinder for trial was compellingly dictated. See *DiNatale v. State,* 8 Md. App. 455; *Sears v. State,* 9 Md. App. 375.

### Constitutionality of Former Section 313B

The provisions of Article 27, Section 313B, under which the appellant was convicted under the first count of Indictment 10832, became law on July 1, 1968.[2] The appellant now contends that this law was, in two respects, so vague and indefinite as to be in contravention of the Sixth and Fourteenth Amendments of the United States Constitution, conferring the right to be informed of the charges against him, and Articles 21 and 23 of the Maryland Declaration of Rights.

He complains that under Section 313B (a) (5) (iv) the meaning of the term "depressant or stimulant drug" is unconstitutionally vague since it is defined as "any drug

---

2. On July 1, 1970, they were, in turn, superseded by Chapter 403, Acts of 1970, which enacted a new and comprehensive Uniform Controlled Dangerous Substances Act, now codified as Art. 27, Sects. 276-302, Maryland Code (1971 Repl. Vol.).

containing any quantity of any substance designated under the provisions of the Federal Drug Act as having potential for abuse to its hallucinogenic effect or its depressant or stimulant effect on the central nervous system." He objects initially to being referred beyond the four corners of the Maryland Statute to the Federal Drug Act. He then complains that, after making that initial reference, his plight is twice confounded since the Federal Drug Act, 21 U.S.C., Section 321(v)(3), reads as follows:

> "(v) the term 'depressant or stimulant drug' means"—
> "(3) lysergic acid diethlamide and any other drug which contains any quantity of a substance which the Secretary, after investigation, has found to have, and by regulation designates as having a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect"—

He objects to the fact that the Federal Drug Act, to which the Maryland law referred him, has, in turn, referred him on to the regulatory promulgations of the Secretary [of Health, Education and Welfare]. To ascertain now which substances the Secretary of Health, Education and Welfare has found, after investigation, to have "a potential for abuse because of its . . . hallucinogenic effect" and has "by regulation" designated as such, he has to look to the *Federal Register*. Indeed, the State offered as State's Exhibit 279, Volume 34, 1969, of the *Federal Register,* page 4888, which showed that "phencyclidine" was proscribed by the Secretary of Health, Education and Welfare because of its hallucinogenic effect. That proscription of "phencyclidine"—"PCP"—was published in the *Federal Register* on March 5, 1969, to become effective on April 6, 1969.

In *Lashley v. State,* 10 Md. App. 136, this Court spoke of the degree of certainty required in criminal statutes, at 142:

"The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law. No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed of what State law commands or forbids; consequently, a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. *Lanzetta v. New Jersey,* 306 U. S. 451; *Connally v. General Construction Co.,* 269 U. S. 385."

We do not believe that the statute in question offends either the United States Constitution or the Maryland Constitution for reasons of vagueness. Indeed, the terms used to designate the contraband substances are terms of scientific precision. The law has application not for unsophisticated laymen, who would, by and large, be incapable of manufacturing chemical compounds even if they wished to, but rather for those with some training and experience, as registered professionals or as practicing amateurs, in the pharmaceutical sciences. These are persons familiar both with the terminology and with the literature. By way of direct application to the situation before us, this appellant admitted that he checked the *Federal Register* every week and that he had compiled extensive literature on all phases of psilocybin (mind-altering) drugs.

Indeed, the threnody as developed by the appellant belied its announced theme. The appellant complained that the law was vague and gave him no clear answers. He then set out to establish rather that the route to the answer was circuitous, not that the answer itself was unclear. We hold that the provisions of Article 27, Section 313B, as they existed from July 1, 1968, to July 1,

1970, were not void for vagueness. We do this, notwithstanding our feeling that the question of the constitutionality of the statute was not properly raised by pretrial motion and that, therefore, the issue was not properly presented for mandatory appellate review. Maryland Rule 725 b; *Vuitch v. State*, 10 Md. App. 389, at 398, and cases cited thereat.

The appellant also complains that Section 313B(a)(6) is unconstitutionally vague when it prescribes:

> "(6) The term 'manufacture, compound or process' includes repackaging or otherwise changing the container, wrapper, or labeling of any drug package, in the furtherance of the distribution of the drug from the original place of manufacture to the person making final delivery or sale to the ultimate consumer. 'Manufacturers, compounders, and processors' refer to any persons engaged in activities defined under this subsection."

He takes umbrage at the presence in that subsection of the word "includes." His contention in this regard is summed up by the question he puts in his brief:

> "Does the word 'includes' in 313B(a)(6) mean that a person should look in Webster's Dictionary for a further definition of the term 'manufacture, compound or process' or, is that definition excluded by virtue of the definition in 313B?"

This latter contention we can dispose of summarily. The terms "manufacture, compound or process" have universally-understood and easily-ascertainable meanings. That meaning is not eroded by the fact that Section 313B(a)(6) broadens the definition, for purposes of this statute, to include "repackaging or otherwise changing the container, wrapper, or labeling of any drug package."

## Delegation of Legislative Power

The appellant contends that when, in the first instance, the Federal Drug Act conferred upon the Secretary of Health, Education and Welfare the power to regulate the manufacture and distribution of certain drugs and when, in the second instance, the former provisions of Article 27, Section 313B, Maryland Code, gave official sanction in this state to those powers conferred by the Congress upon the Secretary of Health, Education and Welfare, there was an unconstitutional delegation of legislative power (from both the national Congress directly and the Maryland General Assembly indirectly) to a member of the executive branch of the Federal Government. This is a classic allegation frequently made in the field of administrative law.

Notwithstanding our belief that the failure of the appellant to make timely objection to what he believes now to have been an unconstitutional statute denies him the right to appellate review on the issue of constitutionality, Maryland Rule 725 b; *Vuitch v. State, supra,* we do not hesitate to dispose of the matter.

Recognizing the fundamental principle that, except when authorized by the Constitution, the Legislature cannot delegate the basic law-making power to any other authority, it is, nevertheless, well-settled that the Legislature may delegate to subordinate officials the power to carry laws into effect, even though such delegation requires the exercise of a certain amount of discretion which may be regarded as part of the police power. *Pressman v. Barnes,* 209 Md. 544, 552. In the Federal field, such vesting of discretion to promulgate regulations implementary of general legislation covers the broad spectrum of the independent regulatory agencies. At the local level, the vesting of such discretion has long been recognized as a necessity in such fields as zoning, housing, traffic control and public health.

The limitation placed upon such delegation is that the statute authorizing the delegation must guide and re-

strain the discretion vested in the subordinate official by standards sufficient "to protect the citizen against arbitrary or unreasonable exercise thereof." *Tighe v. Osborne,* 149 Md. 349, 360. After discussing the necessary discretion which must be permitted to governmental officials, in an increasingly complex society wherein it is impractical, if not impossible, to summons the Legislature to meet every new contingency, Judge Henderson, in *Givner v. Commissioner of Health,* 207 Md. 184, 191, explained that "[i]n the field of public health, still more flexible standards are permitted. The concept of public health is more definite than that of general welfare, and there is a practical necessity for expert interpretation in its application to concrete situations."

We feel that the standards and guidelines imposed upon the Secretary of Health, Education and Welfare were sufficiently definite and sufficiently reasonable to pass constitutional muster. The Secretary, in the section of the statute proscribing lysergic acid diethlamide (LSD) and other depressant and stimulant drugs, was directed, after investigation, to designate other similar substances having "a potential for abuse because of its depressant or stimulant effect on the central nervous system or its hallucinogenic effect." The guidelines furnished the Secretary were preeminently clear.

We note, in passing, that the modern tendency of the courts is toward a greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increases. *Pressman v. Barnes, supra,* 555. We note also that all presumptions favor the constitutionality of a duly enacted statute and such statute will not be declared unconstitutional unless it plainly contravenes the Federal or State Constitutions. *Iozzi v. State,* 5 Md. App. 415, 417; *Woodell v. State,* 2 Md. App. 433, 437.

### Adequacy of Indictment No. 10832

The appellant charges that neither count in Indictment

10832 sets out an offense because it does not describe the drug phencyclidine hydrochloride as a "depressant or stimulant drug" nor as a drug "having potential for its abuse to its hallucinogenic effect." Both counts used the language, "the drug Phencyclidine Hydrochloride, an hallucinogenic drug, commonly known as 'PCP' not being licensed manufacturers, compounders or processors to do so, in violation of Article 27, Section 313B, of the Annotated Code of Maryland."

It is well-settled that an indictment is sufficient if it informs the person charged of the accusation against him as required by Article 21 of the Maryland Declaration of Rights, and if the charge is made with sufficient definiteness to enable him to prepare his defense and to prevent the accused from being charged again with the same offense in a future prosecution. *Lynch v. State,* 2 Md. App. 546, certiorari denied in *Lynch v. State,* 89 S. Ct. 236; *Reagan v. State,* 4 Md. App. 590; *Presley v. State,* 6 Md. App. 419; *Boddie & Brooks v. State,* 6 Md. App. 523; and *Ward v. State,* 9 Md. App. 583. Both counts of the indictment informed the appellant with reasonable certainty of the charges against him, and actually specified the pertinent section of Article 27, which he allegedly violated. The drug was described as an hallucinogenic drug, and it is clear from a cursory reading of the indictment and the statute which is referred to in the indictment that the appellant is charged with a violation of Section 313B (b) of Article 27.

## Request for Removal

On May 6, 1970, and again on May 25, 1970, the appellant filed Suggestions for Removal, based upon allegedly prejudicial pretrial publicity. The trial judge concluded that there had been no potential prejudice arising from pretrial publicity so widespread that it could not properly be cured by *voir dire* examination. This is a matter traditionally resting within the discretion of the trial judge and his decision will only be reversed if there

is shown a clear abuse of his discretion. We do not feel that there was any such abuse in this case.

This case broke publicly on January 14, 1970. An article relating to the case appeared in the Washington *Post* on the morning of the following day, January 15. It appeared in the local section of the paper. An additional article appeared in the Washington *Post* on January 16, along with an accompanying photograph. These appeared on page 3 of the paper. On January 15 a similar article appeared relating to this case in the local section of the Washington *Evening Star*. Nothing further appeared in any newspaper about the case until on May 21, on a local page of the Washington *Post,* and on May 22, buried on the fourth page of the local section of the Washington *Star,* minor articles appeared recounting that a co-defendant, Allison Land, was tendering a plea of *nolo contendere* to the court. In no way can this brief and infrequent coverage be deemed to have permeated the atmosphere of the Montgomery County community and to have denied the appellant the opportunity to obtain a fair and impartial jury in that community.

In *Seidman v. State,* 230 Md. 305, the Court of Appeals said, at 324-325:

> "The question of whether a non-capital criminal case should be removed to another jurisdiction is one which rests within the trial court's discretion, Maryland Constitution, Art. IV, sec. 8; Maryland Rules 542a (1) and 738 (b) ; but the trial court's decision is reviewable on appeal for a determination of whether there has been abuse of discretion . . . the prior cases in this State hold that the accused must make an affirmative showing that he has been prejudiced by the newspaper reports, and that the accused was not in a position to rely upon the *voir dire* examination for protection against a prejudiced juror. [citations omitted]

> Here the trial court could properly find, as it

did, that the articles which appeared prior to trial did not show prejudicial public reaction to the appellant . . . and he asked on *voir dire* whether any juror had formed an opinion of appellant's guilt or innocence as a result of news coverage of 'The Block'. This is not, therefore, a case in which appellant had no way to protect himself from jurors who may have been influenced by press coverage. Cf. *Basiliko v. State, supra,* [212 Md. 248, 129 A. 2d 375] where the articles appeared during the course of the trial when the protection of *voir dire* was not available.

On the general subject of newspaper publicity and a fair trial in a criminal case, see also the remarks of Mr. Justice Holmes in *Holt v. United States,* 218 U. S. 245, 251 (in which newspaper articles appeared during the course of the trial and were apparently read by jurors who had been allowed to separate) : 'If the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain jury trial under the conditions of the present day.' "

See also *Benton v. State,* 1 Md. App. 647; *McLaughlin v. State, supra; Kemp v. State,* 6 Md. App. 463; and *Stevenson v. State,* 9 Md. App. 152.

In response to the *voir dire* questions propounded by the judge, no prospective juror indicated that he had read any of the articles appearing on January 15 or 16. Some prospective jurors did indicate that they had read the articles appearing on May 21 or May 22. When questioned further, however, each of those persons indicated that the fact of having read the article would not in any way derogate from his ability to give the appellant a fair and impartial trial. We do not believe that Judge Shure abused his discretion in denying the appellant his Request for a Removal.

## Peremptory Challenges

After the State's motion to consolidate for trial the five indictments against the appellant had been granted, the appellant requested of the court the right to exercise one hundred (5 × 20) peremptory challenges. The motion was denied. Shortly thereafter, the appellant retrenched somewhat in his demands and requested fifty-two [presumably (2 × 20) + (3 × 4)] peremptory challenges. The court denied this request. The court subsequently did grant to the appellant thirty peremptory challenges.

> Nothing could be more clear than Maryland Rule 746:
>
> "a. Number.
> 1. Non-Penitentiary and Non-Capital Case.
> In a trial for an offense not punishable by death or confinement in the penitentiary, each party shall be permitted four peremptory challenges. Several defendants shall be considered a single party for this purpose. Whenever it appears that the trial involves two or more defendants having adverse or hostile interests, the court may allow additional peremptory challenges, but no defendant shall be allowed more than four such challenges.
> 2. Penitentiary or Capital Case.
> In a trial for an offense punishable by death or confinement in the penitentiary, each defendant shall be permitted twenty peremptory challenges and the State shall be permitted ten peremptory challenges for each defendant."

See also *Laws and Dorman v. State,* 6 Md. App. 243, 247-248.

The problem is one of elementary multiplication. If the most serious charge on trial is a non-penitentiary offense, the multiplicand is four and the multiplier is one, no matter how many such offenses are on trial and no matter how many defendants are on trial, unless mul-

tiple defendants have adverse or hostile interests. If the most serious charge on trial is a capital or penitentiary offense, the multiplicand is twenty; the multiplier is not the number of charges on trial but rather the number of persons on trial—in this case, one. The appellant will not now be heard to complain that the judge, in an error of generosity, granted to him 150 per cent of that to which he was legally entitled.

## Probable Cause for the Search Warrants

The appellant complains that there was not spelled out in the applications for the search warrants adequate probable cause to justify the issuance of those warrants. Although there are minor variations among the facts set out in the various applications, the central core of probable cause is common to all. A review of those applications makes it abundantly clear that probable cause did exist to justify the issuance of the warrants.

The whole corpus of case law, Federal and State, makes clear that probable cause means less than evidence which would justify condemnation; and that in measuring probable cause reviewing courts will not be hypertechnical in dissecting applications for warrants, lest the very salutary resort to warrants be discouraged. *United States v. Ventresca,* 380 U. S. 102, 108; *Aguilar v. Texas,* 378 U. S. 108, 111; *Brinegar v. United States,* 338 U. S. 160, 173; *State v. Swales,* 12 Md. App. 69, 73-75; *Scott v. State,* 4 Md. App. 482, 488-489.

The applications for probable cause in this case spelled out that agents of the Bureau of Narcotics and Dangerous Drugs had been conducting a surveillance on the activities of the appellant over a period of approximately six months and that, on numerous occasions during that period, he had been observed to purchase precursors used in the production of phencyclidine hydrochloride (PCP), an hallucinogenic drug under proscription both Federally and in the State of Maryland. The agents had also noticed one Vicki Ford in the company of the appellant when he would travel to Philadelphia to pick up the chemical pre-

cursors and return them to Maryland. The agents recounted that on November 3, 1969, Vicki Ford was arrested both for the unlawful possession of LSD and for the unlawful sale of PCP. In the applications for the warrants, the officers then recounted that Vicki Ford had related to them that on numerous occasions between April, 1969, and January, 1970, she had assisted the appellant in manufacturing PCP, that she had picked up PCP from him in order to make unlawful sales to others, that she had travelled to Philadelphia with him to procure chemicals for the manufacture of PCP, that she had been with him when he had manufactured PCP at a farm in Easton, Maryland, and that she had observed him hide hallucinogenic drugs of several varieties in a number of the suspected premises. The Federal agents recounted in the applications that they had, on four occasions, purchased PCP from Vicki Ford. They further recited that the appellant had been convicted in December, 1969, for the sale of hashish in Washington, D. C.; had been convicted in June, 1968, in Worcester County, Maryland, both for the possession of narcotics implements and for the possession of ingredients to produce LSD; and had been convicted, in November, 1968, for violations of the Dangerous Drug Act. Such recitations speak for themselves in demonstrating the amplitude of probable cause.

### Veracity of the Application for Probable Cause

The appellant next turns his attack from the sufficiency to the veracity of the recitations in support of probable cause. He focuses primarily on the fact that certain parts of the trial testimony of Vicki Ford might well be contradictory to the story told by Vicki Ford to the investigating officers and then recited by them in the applications for the search warrants.

The law is too well-settled to require reiteration that the court's determination of the existence *vel non* of probable cause must be confined solely to the four corners of the affidavit itself and that evidence outside the

affidavit, no matter by whom produced or how, is not relevant to the inquiry of probable cause. *Smith v. State,* 191 Md. 329, 335; *Sessoms v. State,* 3 Md. App. 293, 296-297; *Scott v. State, supra; Gerstein v. State,* 10 Md. App. 322; *Dawson v. State,* 11 Md. App. 694, 714-715. We are not persuaded to overturn this settled and salutary body of precedent.

## Disqualification of Trial Judge

Penultimately, the appellant argues that Judge Shure should have acceded to the appellant's motion for the judge to disqualify himself. That motion was premised upon the fact that Judge Shure had earlier sat upon the trial of Michael Gill and had heard the *nolo contendere* plea of Allison Land but had not yet sentenced either of them. Such fact is beside the point, since Judge Shure was not sitting as the factfinder upon the appellant's case but was simply presiding over the presentation of that case to a jury. See *Lane v. State,* 226 Md. 81; *Day v. State,* 2 Md. App. 334; *Thomas v. State,* 2 Md. App. 645; *Stallard v. State,* 6 Md. App. 560; and *Laws v. State,* 7 Md. App. 84.

The appellant argues further that the threat of a yet impending sentence hanging over the head of Gill may well have influenced Gill in his determination to invoke the privilege against self-incrimination and not to testify as a defense witness. Whatever privilege or disposition Gill may or may not have had vis-a-vis his testifying, that privilege and disposition was personal unto himself alone and in no way attaches to the appellant.

## Legal Sufficiency of the Evidence

It is clear that in a jury trial, the test as to whether the evidence was sufficient in law to permit the trial judge properly to deny the appellant's motion for a judgment of acquittal and to submit the case to the jury is whether the admissible evidence adduced at the trial either showed directly, or circumstantially, or supported a rational inference of, the facts to be proved, from which

684

the jury could fairly be convinced, beyond a reasonable doubt, of the appellant's guilt of the offense charged. *Williams v. State,* 5 Md. App. 450; *Metz v. State,* 9 Md. App. 15, 23.

In view of the massive evidence adduced at the trial, and largely hereinbefore discussed, it is to belabor the self-evident to assert that it was patently ample for the jury fairly to be convinced, beyond a reasonable doubt, of the appellant's guilt.

> *As to indictment 10827, 10828, 10829, 10830, and the second count of 10832, judgment is affirmed; as to the first count of 10832, the judgment is affirmed but the sentence is vacated and the case is remanded for resentencing in accord with this opinion; costs to be paid by appellant.*