## JOSEPH H. MUNSON COMPANY, INC. *v.* SECRETARY OF STATE FOR THE STATE OF MARYLAND

[No. 925, September Term, 1980.]

*Decided March 11, 1981.*

The cause was argued before GILBERT, C. J., and MORTON and MOORE, JJ.

*Mark A. Winkler,* with whom was *Yale L. Goldberg* on the brief, for appellant.

*James G. Klair, Assistant Attorney General,* with whom

was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

GILBERT, C. J., delivered the opinion of the Court.

Sometimes a government, in its zeal to protect the governed, enacts laws that trespass unnecessarily upon the constitutional rights of some of the governed. It is extremely difficult in regulating any practice, custom, business, or industry not to trample, to a degree, upon the constitutional rights of someone. Governmental intrusion upon the constitutional rights of one group for the protection of a larger group, while looked upon with disfavor, is not, however, *ipso facto* invalid. The test is not whether there has been an infringement upon the rights of those regulated, but rather, whether the regulation unnecessarily encroaches on the rights of the regulated.

In this appeal, we must examine a State statute in order to determine whether it is unconstitutional.

The Preamble to Laws 1976, ch. 679 [1] provides in part:

"The Governor on August 16, 1974, created a Commission on Charitable Organizations to examine the existing statutes and to make recommendations. The Commission concluded its work and found that the present laws [2] were inadequate and recommended the original bills (S.B. 287, H.B. 487) in their unamended form. These bills as introduced by the Administration were nearly identical to the 'Model for State Legislation Regulating Charitable Organizations' and endorsed by the numerous National Voluntary Health Agencies."

The Preamble also stated that bills had been "introduced in the 1975 Session as a result of impetus coming" from publications in which it was alleged that "various organizations soliciting funds from the public had excessively high administrative and other expenses, which resulted in a rela-

1. Introduced in the General Assembly as House Bill No. 777.
2. Md. Ann. Code art. 41, §§ 103A-103E (1971 Repl. Vol.).

tively small portion of the contributions ... being used for their intended purpose."

Obviously, chapter 679 was enacted with the intent of protecting the public by assuring that the organization that solicited the funds was regulated as to the amount of monies that went toward "expenses in connection with ... [the] fund-raising activity." Section 3 of that chapter created what is now also known as Md. Ann. Code art. 41, § 103D. That section provides:

"(a) A charitable organization other than a charitable salvage organization may not pay or agree to pay as expenses in connection with any fund-raising activity a total amount in excess of 25 percent of the total gross income raised or received by reason of the fund-raising activity. The Secretary of State shall, by rule or regulation in accordance with the 'standard of accounting and fiscal reporting for voluntary health and welfare organizations' provide for the reporting of actual cost, and of allocation of expenses, of a charitable organization into those which are in connection with a fund-raising activity and those which are not. The Secretary of State shall issue rules and regulations to permit a charitable organization to pay or agree to pay for expenses in connection with a fund-raising activity more than 25% of its total gross income in those instances where the 25% limitation would effectively prevent the charitable organization from raising contributions.

The 25% limitation in this subsection shall not apply to compensation or expenses paid by a charitable organization to a professional fund-raiser counsel for conducting feasibility studies for the purpose of determining whether or not the charitable organization should undertake a fund-raising activity, such compensation or expenses paid for feasibility studies or preliminary planning not being considered to be expenses paid in connection with a fund-raising activity.

(b) For purposes of this section, the total gross income raised or received shall be adjusted so as not to include contributions received equal to the actual cost to the charitable organization of (1) goods, food, entertainment, or drink sold or provided to the public, nor should these costs be included as fund-raising costs; (2) the actual postage paid to the United States Postal Service and printing expense in connection with the soliciting of contributions, nor should these costs be included as fund-raising costs.

(c) Every contract or agreement between a professional fund-raiser counsel or a professional solicitor and a charitable organization shall be in writing, and a copy of it shall be filed with the Secretary of State within ten days after it is entered into and prior to any solicitations."

Joseph H. Munson Company, Inc., an Indiana corporation (Munson), and a "promotion business," was desirous of entering into a contract with the Fraternal Order of Police, Montgomery County Chapter (F.O.P.). Munson was to raise funds for F.O.P., an organization, described in the stipulation of facts, which was engaged in the dissemination of information and the promotion of causes on behalf of police officers. Because of the fee limitations prescribed in the statute referred to above, no contractual relationship developed between Munson and F.O.P.

Apparently believing itself unlawfully barred *from doing business in Maryland* because of section 103D, Munson filed, in the Circuit Court for Anne Arundel County, a bill of complaint in which it sought a declaratory decree that would hold section 103D unconstitutional. The Secretary of State for the State of Maryland (Secretary) was named as defendant. The court was asked to enjoin permanently the enforcement of the registration provisions and the civil or criminal sanctions permitted by that statute.[3]

---

**3.** The Secretary of State is charged with investigating any alleged violations of the Charitable Organizations Subtitle of Article 41, §§ 103A —

The case was heard in the circuit court by Judge Eugene M. Lerner on a stipulation of facts. The judge held that Munson was not entitled to declaratory relief "since ... [Munson] has not exhausted its administrative remedies." Furthermore, the trial judge stated that there was no improper delegation of authority to the Secretary of State, and that the statute is constitutional.

On appeal to this Court, Munson poses three questions which we believe may be stated fairly in but one,[4] scilicet:

---

103L. Upon finding a violation, subsection 103L (b) confers upon the Secretary several enforcement alternatives, namely:

"(1) Cancel and annul the registration of the violator;
(2) Refer the matter to the Attorney General for civil enforcement ...; and
(3) Refer the matter to the appropriate State's attorney for prosecution."

Additionally, section 103L (a) declares the criminal penalties for violating the Charitable Organizations Act to be:

"A charitable organization, professional fund-raiser counsel, or professional solicitor which wilfully fails to file a registration statement, report, or other information with the Secretary of State or wilfully files such a statement, report, or other information which is materially false, or otherwise wilfully violates the requirements of this subtitle, is guilty of a misdemeanor, and, upon conviction, shall be fined not more than $5,000 or sentenced to imprisonment for not more than one year, or be both fined and imprisoned."

4. The three questions raised by Munson were:

"1. Should not the decision below be reversed for reason that Article 41, Section 103D of the Annotated Code of Maryland is unconstitutional and in violation of the Appellant's rights under the First and Fourteenth Amendments of the United States Constitution in light of the facts that the said statute is overbroad in its regulation of protected speech activities, in that it bears an insignificant relation to asserted State interests, fails to utilize the least drastic means available to serve such interests and fails to provide any Constitutionally sufficient exception to the 25% expense limitation?

2. Did not the lower court err in holding that the proper construction of the exception in Section 103D is sufficiently broad to include a 'flexible' percentage scheme and the statute is therefore Constitutional, in light of the facts that the plain language and obvious intent of the exception power is insufficient to create such a flexible scheme; and further, even if such a flexible scheme is included, such a scheme is no less intrusive on First Amendment interests than is a fixed percentage scheme?

3. Did not the lower court err in holding that the proper construction of the exception in Section 103D is sufficiently broad to

Is Md. Ann. Code art. 41, § 103D unconstitutional on the basis that it infringes on the First Amendment right of freedom of speech, and is it an impermissible delegation of legislative authority to the Secretary?

## — PRELIMINARY ISSUE OF STANDING —

Before we undertake to discuss the constitutionality *vel non* of section 103D, we must first consider the Secretary's contention that Munson lacks standing to challenge the statute and, therefore, is not a proper party to have brought the suit in the first instance.

Our review of the record discloses that in response to the original bill of complaint the Secretary, in a motion to dismiss, averred *inter alia* that Munson was not an "interested ... [party] asserting adverse claims ...." The motion was heard by Judge H. Chester Goudy, Jr., who granted the dismissal in part and denied it in part. Significantly, he did not rule upon Munson's standing as an "interested party."

Subsequently, Munson filed an amended bill. The Secretary answered it without posing any question as to Munson's being an "interested party." Nevertheless, the Secretary did raise the question minimally in a Memorandum of Law that it submitted to Judge Lerner. We characterize the standing issue as minimally posited because in eleven pages of typing the only reference to standing is the single sentence, "The ... [Secretary] seriously questions ... [Munson's] standing to seek a declaratory judgment."

Apparently the Assistant Attorney General, representing the Secretary, had misgivings about the inattention given to standing in his Memorandum of Law because approximately two weeks later he submitted to Judge Lerner a "Supplemental Memorandum of Law." In the supplement, he dispelled any doubt as to the Secretary's position with

protect First Amendment interests, in light of the fact that under such a broad construction, the discretion vested in enforcement officials as a result of the lack of standards is itself an unconstitutional infringement on First Amendment interests?"

respect to Munson's standing inasmuch as the entire supplemental memorandum is devoted exclusively to that question.

Judge Lerner, in his "Memorandum Opinion and Order," did not, however, address the issue of standing but denied relief strictly on the questions of constitutionality.

Md. Rule 1085 provides in part that "[t]his Court will not ordinarily decide any point or question which does not plainly appear ... to have been tried and decided by the lower court. ..."

We decline to consider the issue of standing because it was not decided by Judge Lerner inasmuch as he made his decision on other grounds. Md. Rule 1085. *But see, Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 634, 100 S. Ct. 826, 834-35, 63 L. Ed. 2d 73 (1980); *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S. Ct. 1116, 1121, 14 L. Ed. 2d 22 (1964); *United States v. Raines,* 362 U.S. 17, 21, 80 S. Ct. 519, 522, 4 L. Ed. 2d 524 (1960); *Thornhill v. Alabama,* 310 U.S. 88, 97-98, 60 S. Ct. 736, 742, 84 L. Ed. 2d 1093 (1939).

## —*CONSTITUTIONALITY* VEL NON *OF MD. ANN. CODE ART. 41, § 103D*—

The Supreme Court has held that the regulation of charitable solicitation is a function of the State's police power and a fulfillment of its duty to protect its citizens from fraudulent charitable organizations. *Hynes v. Mayor of Oradell,* 425 U.S. 610, 96 S. Ct. 1755, 48 L. Ed. 2d 243 (1976). The Court has also recognized that First Amendment freedoms are intertwined with any type of solicitation and should be protected. *See Virginia Pharmacy Board v. Virginia Consumer Council,* 425 U.S. 748, 96 S. Ct. 1817, 48 L. Ed. 2d 346 (1976) (commercial solicitation); *Hynes v. Mayor of Oradell, supra* (charitable and political solicitation); *Cantwell v. Connecticut,* 310 U.S. 296, 60 S. Ct. 900, 84 L. Ed. 2d 1213 (1940) (religious solicitation). At first blush it would seem that *Hynes* is in conflict with the free speech solicitation right. The conflict, however, may be

reconciled by the State's imposing reasonable regulations on charitable solicitations.

Recently, in *Village of Schaumburg v. Citizens for a Better Environment, supra,* the Court, speaking through Justice White, addressed the balancing of police power *vis-a-vis* solicitations. The Village ordinance prevented a charitable organization from obtaining a solicitation permit unless " '[s]atisfactory proof that at least seventy-five percent of the proceeds of such solicitations . . . [would] be used directly for the charitable purpose of the organization.' " (Footnote omitted.) 444 U.S. at 624, 100 S. Ct. at 829. Citizens for a Better Environment (Citizens), an organization that promoted the protection of the environment, was denied a permit by the Village inasmuch as Citizens "could not demonstrate that 75 percent of its receipts would be used for 'charitable purposes' . . . ." *Id.* at 625, 100 S. Ct. at 830. Citizens' excessive expenditures were attributed to its employment of door-to-door "canvassers" who, in addition to collecting contributions, distributed " 'literature on environmental topics and answer[ed] questions of an environmental nature when posed' " and accepted complaints about the state of the environment. *Id.* As a result of the Village's refusal to grant a permit to Citizens, it challenged the ordinance on the ground that it violated its First and Fourteenth Amendment rights to freedom of speech.

The Court held the particular ordinance to be an unconstitutional infringement on freedom of speech. Charitable solicitations are a form of speech entitled to First Amendment protection, the majority said.[5] To pass constitutional muster, any State regulation of charitable solicitation must "serve a sufficiently strong, subordinating interest . . . that the . . . [State] is entitled to protect." *Id.* at 636, 100 S. Ct. at 836. Consequently, the regulation must be drawn in such a narrow manner as to serve the State's interest "without unnecessarily interfering with First Amendment freedoms." *Id.* at 637, 100 S. Ct. at 836. *See Consolidated Edison Co. v. Public Service Commission,* 447

5. Justice Rehnquist dissented. 444 U.S. at 639-45, 100 S. Ct. at 837-40.

U.S. 530, 100 S. Ct. 2326, 65 L.Ed.2d 319 (1980). Earlier, in *NAACP v. Button*, 371 U.S. 415, 438, 83 S. Ct. 328, 340, 9 L. Ed. 2d 405 (1963), the Court had opined that "[b]road prophylactic rules in the area of free expression are suspect. . . . Precision of regulation must be the touchstone. . . ." (Citations omitted.)

Although the Court believed the Village's interest in protecting its citizens from "fraud, crime and undue annoyance," was substantial, the inflexible 25% solicitation limitation was not narrowly drawn and interfered "unnecessarily" with the freedom of speech. The Court rejected Village's rationale that "any organization using more than 25 percent of its receipts on fundraising, salaries, and overhead is not a charitable, but a commercial, for profit enterprise and that to permit it to represent itself as a charity is fraudulent." 444 U.S. at 636, 100 S. Ct. at 836. The Supreme Court agreed with the United States Court of Appeals (7th Cir.) that "this cannot be true of those organizations that are primarily engaged in research, advocacy, or public education and that use their own paid staff to carry out these functions *as well as solicit financial support.*" (Emphasis supplied.) *Id.* Such organizations may need to spend more than 25% of the solicitation on non-charitable purposes. Village's ordinance failed to take into consideration the research, advocacy or public education type of organizations and summarily prevented them from soliciting funds for their charitable purpose.

The Court noted that "Village's legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on solicitation." *Id.* at 637, 100 S. Ct. at 836. Among other things, Village may prohibit "fraudulent misrepresentations" and enact penal laws to punish violations.

The flaw in the ordinance that Village enacted was the ban on solicitation by any charitable organization that expended more than 25% of its funds for charitable purposes. The prior restraint imposed on all charitable organizations without exception was an unnecessary intrusion on the freedom of speech. The ordinance either ignored or arbi-

trarily classified all charitable organizations as one and the same. By so doing, they failed to recognize that the research, advocacy, or educational organization fits a different mold. Moreover, the ordinance also failed to acknowledge that there might be a valid reason why more than 25% of the proceeds was needed at a given time for other than strictly charitable purposes. Even if a charitable solicitor could show clearly that a sum greater than 25% was necessary to its particular needs, the demonstration would have been to no avail because the ordinance permitted no flexibility.

Statutes or ordinances regulating the solicitation of funds by charitable organizations have, however, been judicially sanctioned. *See e.g., National Foundation v. City of Fort Worth,* 415 F.2d 41 (CA5 1969), *cert. denied,* 396 U.S. 1040 (1970). We must then look to the holdings of such cases in order to find the reason or reasons why those ordinances or statutes were free of constitutional defect.

The *National Foundation v. Fort Worth* ordinance required each charitable organization to obtain a license before solicitation of funds. The license would be denied if it was determined that an applicant was expending, or was expected to spend for solicitation costs, more than 20% of the gross amount raised. The 20% limitation was not, however, an inflexible barrier. An applicant with an expenditure or expected expenditure of more than the specified 20% could, nevertheless, obtain a license if it demonstrated special facts or circumstances that reasonably justified such an expenditure. The Fifth Circuit Court of Appeals said that the pliant feature in the 20% limitation buttressed the ordinance's constitutionality by recognizing that a fixed percentage "might be undesirable and inapplicable if applied to all types of charitable organizations." *Id.* at 46. Furthermore, the suppleness of the limitation made it "a valid and constitutional means of achieving the city's purpose of protecting its citizens." [6]

---

**6.** It is interesting to note that the *Schaumburg* Court distinguished the Fort Worth ordinance from the Schaumburg ordinance and impliedly endorsed the 20% flexible limitation as a constitutional means of regulating charitable solicitation. 444 U.S. at 635, n. 9, 100 S. Ct. at 835. Unlike the

Another case in which a charitable solicitation regulation ordinance was held to be constitutionally valid is *Holloway v. Brown,* 62 Ohio St. 2d 65, 403 N.E.2d 191 (1980). There, a solicitation permit would not be issued if the cost of solicitation was more than 15% of the gross total raised through the solicitation. Excessive expenditures were, however, only *prima facie* evidence of unreasonableness, and the permit would be issued if the applicant could show that spending more than 15% of the gross solicitation was reasonable. The court concluded that the ordinance was sufficiently narrow to comply with *Schaumburg's* standards. Manifestly, the saving feature of the ordinance was the elasticity allowed in the percentage limitation. The limitation, coupled with the authority to increase it for good cause, enabled the local government to "screen out only those solicitations which indeed pos[ed] a substantial risk of invoking fraud or misrepresentation." *Id.* at 73-74, 191 N.E.2d at 197.

A similar regulation was addressed in *National Black United Fund, Inc. v. Campbell,* 494 F. Supp. 748 (D.C.D.C. 1980), wherein a federal program allowed charitable organizations "the luxury" of soliciting federal employees while the employees were at work. In order to be eligible for participation in the program, an organization had to meet certain requirements, one of which was a fixed percentage limitation on the cost of administrative expenses. If those expenses exceeded 25% of the organization's annual income, the organization had to demonstrate that the excess expenditures were reasonable.

The district court struck down the regulation on the basis that it was unconstitutionally applied. The court, however, concluded that the regulation was valid on its face. In so doing, the court recognized that the "flexible percentage limitation" distinguished the valid federal regulation from that of the Schaumburg ordinance.

---

Fort Worth ordinance, the regulation in *Schaumburg* failed to provide means whereby an organization, which legitimately needed to expend more than 25% on non-charitable costs, could show that the excessive cost was reasonable.

With the holdings of *Schaumburg, National Foundation, Holloway* and *National Black United Fund, supra,* firmly in mind, we shall begin our analysis of the above-quoted § 103D of Article 41.

We observe that the Maryland statute is similar to those found in *National Fund, Holloway* and *National Black United Fund.* In all three of those cases, the laws limiting solicitations were held to permit enough flexibility to survive an attack built upon First Amendment freedom of speech. While it is true that section 103D proscribes the expenditure for non-charitable purposes of more than 25% of the gross total income raised through a fund-raising activity, any charity may be exempted from the strictures of that prohibition if the charity demonstrates that "the 25% limitation would effectively prevent ... [it] from raising contributions." An organization which legitimately needs to expend more than 25% of its total gross income for administrative costs is not summarily characterized as "fraudulent" and, thereby, subjected to prosecution, as were the charitable organizations in *Schaumburg, supra.*

Additionally, the spending limitation of section 103D does not place a prior restraint on the First Amendment freedom of speech associated with charitable solicitation. As we see it, section 103D regulates charitable solicitation through the means suggested by the *Schaumburg* court, namely, penal laws and financial disclosure requirements. While registration is mandated in order for a charitable organization to solicit contributions, Md. Ann. Code art. 41, § 103B, the organization is not denied registration, *ipso facto,* if it expends more than 25% of its funds for non-charitable purposes. Irrespective of the amount spent or to be spent on solicitation, a license is issued upon completion of the registration. Should a registered charity then decide to expend more than the sanctioned 25% on non-charitable costs, without being exempted by the Secretary, it violates section 103D and is, thereby, exposed to the criminal penalties spelled out in section 103L. The threat of criminal prosecution, not prior restraint, deters fraudulent activity.

The registration statements, dictated by Md. Ann. Code art. 41, § 103B, contain an "income and expense statement, and a financial report (including the kind and amount of its gross income raised, costs and expenses incidental to the fund-raising activities . . .) . . . ." Pursuant to Md. Ann. Code art. 41, § 103G, the statement becomes a public record and, of course, is open to public scrutiny. Furthermore, the actual contracts between a charity and a professional solicitor are also filed as public records, *Id.,* after having been filed with the Secretary. Md. Ann. Code art. 41, § 103D (c).

We think section 103D regulates First Amendment freedom of speech in such a way as to minimize encroachment upon individual rights while simultaneously protecting the citizenry of this State from sham and fraud. In sum, section 103D is drawn in a manner calculated to protect the public interest "without unnecessarily interfering with First Amendment freedoms." The statute is constitutional.

## —THE DELEGATION OF LEGISLATIVE AUTHORITY—

Munson's lawyers, as careful tacticians, did not "put all their eggs in one basket." They had a fall-back position. In the instant case, it took the form of an assault upon what Munson avers to be an unconstitutional delegation of legislative authority to the Secretary.

Munson asserts that section 103D vests too much discretion in the Secretary in that there are insufficient standards because reasonable guidelines are not present. We have an entirely different view.

Rarely has a statute been held unconstitutional because of an impermissible delegation of legislative power.[7] The rule used in measuring whether the Legislature has properly delegated authority is:

---

**7.** Davis, 1 *Administrative Law Treatise* §§ 2.01-.16 (1958).

The Legislature has the power to grant to an administrative agency the discretion to implement statutory provisions, through rules and regulations, provided that the agency is furnished reasonable guidelines or standards to follow in fulfilling the legislative command.

*Governor of Maryland v. Exxon Corp.,* 279 Md. 410, 370 A.2d 1102 (1977); *Gino's of Maryland, Inc. v. City of Baltimore,* 250 Md. 621, 244 A.2d 218 (1968); *Mason v. State,* 12 Md. App. 655, 280 A.2d 753 (1971).

As we see it the Legislature has delineated clearly the guidelines to be followed by the Secretary in implementing the charitable organization's 25% "overhead" limitation whenever funds are solicited from the public. The guidelines are:

1) Section 103D (a) instructs the Secretary to use the "standard of accounting and fiscal reporting for voluntary health and welfare organizations" when allocating costs of an organization between those expended in connection with a fund-raising activity and those which are not.

2) Section 103D (b) sets out the expenditures which are not to be included in the total gross income when computing the 25% limitation, nor are they to be considered as fund-raising costs. The exclusions are the costs of "goods, food, entertainment, or drink sold or provided to the public" and "the actual postage paid ... and printing expense in connection with the soliciting of contributions."

3) After the authorized deductions are made from the total gross income generated by the fund-raising solicitation, the 25% limitation on non-charitable expenses is computed.

4) If the expenditure for non-charitable purposes exceeds 25% of the total gross, less allowable deductions, a charity can avoid violating section

103D if the Secretary of State determines that "the 25% limitation would effectively prevent the charitable organization from raising contributions."

The Secretary, in accordance with the legislative directive relative to the adoption of rules and regulations, has promulgated regulations that provide a mechanism through which a charitable organization can demonstrate to the Secretary that the 25% limitation would amount to prohibition of the charity's fund-raising activity. *See* COMAR .01.02.04.05-.13.

We hold that Md. Ann. Code art. 41, § 103D is not constitutionally ailing. The Legislature did not impermissibly delegate authority to the Secretary. Judge Lerner did not err in upholding the validity of the statute.

*Judgment affirmed.*
*Costs to be paid by appellant.*