**NATIONAL BLACK UNITED FUND, INC., Plaintiff,**

v.

**Alan K. CAMPBELL, Director, United States Office of Personnel Management, Defendant,**

and

**United Way of America, Defendant-Intervenor.**

Civ. A. No. 76–1431.

United States District Court, District of Columbia.

July 1, 1980.

Stephen J. Dutton, Indianapolis, Ind., Allen T. Eaton, Daniel R. Efroymson, John W. Garland, Washington, D. C., for plaintiff.

Joseph Remcho, Thelton E. Henderson, San Francisco, Cal., David Addlestone, Washington, D. C., for National Council of the Churches of Christ in the U.S.A.

Thomas J. Gagliardo, Washington, D. C., R. Davy Eaglesfield, III, Indianapolis, Ind., for National Convocation of the Christian Church.

Robert A. Murphy, Elizabeth R. Rindskopf, Washington, D. C., for National Committee for Responsive Philanthropy.

Craig H. Scott, Sylvia Roberts, Baton Rouge, La., for National Organization for Women Legal Defense and Education Fund, Inc.

Jack Greenberg, Charles Stephen Ralston, New York City, Barry Goldstein, Roderic V.O. Boggs, Washington, D. C., for NAACP Legal Defense and Education Fund, Inc.

Vilma S. Martinez, San Francisco, Cal., Abelardo I. Perez, Mexican American Legal Defense and Educational Fund, Washington, D. C., for IMAGE.

Dennis A. Dutterer, Asst. U. S. Atty., Washington, D. C., for defendant.

John S. Koch, Washington, D. C., for defendant-intervenor.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this proceeding the National Black United Fund (NBUF) challenges the eligibility criteria employed and the manner in which they were applied in denying its application to participate in the Combined Federal Campaign (Combined Campaign or Campaign), alleging principally that rights guaranteed by the First and Fifth Amend-

ment to the United States Constitution have been violated. Plaintiff NBUF, a national voluntary welfare organization, applied to the United States Civil Service Commission seeking to participate in the Combined Campaign, an on-the-job solicitation directed at federal government employees by charitable organizations. The Chairman of the Civil Service Commission was responsible for regulating the solicitation. When its application was rejected the NBUF filed this suit against the Chairman.[1]

The plaintiff seeks appropriate declaratory and injunctive relief. More specifically, NBUF seeks an order directing that it be allowed full opportunity to participate in the Combined Federal Campaign as a national voluntary agency. Earlier in this proceeding NBUF sought a preliminary injunction enjoining any Combined Campaign activities pending the final resolution of this action. That application was denied. In the course of this litigation, United Way of America, Inc. (United Way) which opposed NBUF's efforts to participate in the Combined Campaign was granted permission to intervene as defendant-intervenor. United Way is a national voluntary agency which assists united or federated fund-raising efforts of local charities. It has participated extensively in the formulation of the policy and the organization of the Combined Campaign.

Presently before the Court are cross-motions for summary judgment filed by the NBUF, defendant and the defendant-intervenor. In support of the NBUF motion *amici* briefs were submitted by several national organizations: National Council of the Churches of Christ in the U.S.A.; National Convocation of the Christian Church; National Committee for Responsive Philanthropy; National Organization of Women Legal Defense and Education Fund, Inc.;

NAACP Legal Defense and Educational Fund, Inc.; and IMAGE, an organization of Hispanics employed by federal, state and local governments.

The memoranda of law submitted by the parties and by *amici curiae*, the administrative record, affidavits, and other relevant data[2] have been considered and this Court determines that the defendants' motion for summary judgment should be denied and the plaintiff's motion should be granted. The National Black United Fund is entitled to appropriate relief and its application to participate in the Combined Federal Campaign as a national voluntary agency should be considered by the defendant, in a manner consistent with the conclusions set forth in this opinion.

I.

FACTUAL BACKGROUND

The material undisputed facts are as follows. In 1961, responding to the burden imposed by the increasing number of fund-raising drives directed toward federal employees, President Kennedy established a mechanism for the solicitation of charitable donations within the federal workplace. In Executive Order 10927[3] the President delegated authority to arrange for such solicitations to the Chairman of the Civil Service Commission. The Chairman was authorized to carry out the Order in such a manner as to "permit true voluntary giving," and empowered to:

> make arrangements for such national voluntary health and welfare agencies and such other national voluntary agencies as may be appropriate to solicit funds from Federal employees and members of the armed forces at their places of employment or duty stations.

---

1. With the abolition of the Civil Service Commission, the Chairman's functions were transferred to the Office of Personnel Management. Reorganization Plan No. 2 of 1978, § 102, 43 Fed.Reg. 36037; Civil Service Reform Act of 1978, Pub.L.No.95–454, 92 Stat. 1111. The Office of Personnel Management is substituted as party defendant, Rule 25, Fed.R.Civ.P.

2. *See e.g. Hearings on the Combined Federal Campaign Before the Subcomm. on the Civil Service of the House Comm. on Post Office and Civil Service,* 96th Cong., 1st Sess. (October 11–19, 1979).

3. The Executive Order was issued on March 18, 1961. The full text is set forth in Appendix A.

E.O. 10927 at § 2(a). He was also authorized to consult with appropriate persons in the government and the charitable organizations for advice in fulfilling his task. *Id.* at § 2(b).

### A. The Combined Federal Campaign

Pursuant to this executive mandate, the Chairman instituted the Combined Campaign—a unified annual solicitation drive. Organization of a campaign incorporating all solicitations by national health and welfare agencies as well as international organizations into a single mechanism was an endeavor of great proportions. In carrying out the executive directive, the Chairman established three auxiliary bodies to aid him: an Advisory Council, an Eligibility Committee and a Policy Committee.

The Advisory Council was responsible for assisting in the development of policies, procedures and eligibility requirements.[4] The Council, purportedly representative of the voluntary agencies participating in the federal program, assisted in the development of a *Manual on Fund Raising Within the Federal Service for Voluntary Health and Welfare Agencies* (Manual). It also helped promulgate eligibility guidelines and establish operating mechanisms for the solicitation of federal employees by charitable organizations. While challenged by the defendants, the plaintiff claims that the formation of the Advisory Council initiated a practice of dominance by United Way in the Combined Campaign. The Chairman set aside one of the four positions on the Advisory Council for the president of the United Way on a continuing basis. The other three positions were filled by the president of the Red Cross, a national voluntary health agency, and, on a rotating basis, the presidents of a participating international agency and a participating national health agency. It appears clear that from the outset, United Way was the presumed representative of national welfare organizations and, as a matter of practice throughout most of the history of the Combined Campaign, welfare agencies could join in the Campaign only through affiliation with United Way's national network.

The Policy Committee is appointed by the Chairman and provides him with direct working participation in the development of the Combined Campaign. It consists of fund-raising coordinators from the government agencies and representatives of the largest employee organizations. The Committee acts through general meetings and *ad hoc* working committees as required.

The Eligibility Committee makes recommendations to the Chairman on applications from national voluntary agencies, reviews and modifies eligibility standards and requirements as needed, and submits periodic reports to the Chairman as required. The Committee membership includes representatives of federal agencies and employee organizations chosen by the Chairman from the membership of the Policy Committee.

As a matter of policy and practice, federal employees are permitted to spend substantial amounts of on-the-job time in connection with the Combined Campaign, serving on the various committees and working within their agency. In addition, the government bears the expense of maintaining the accounting and financial records associated with the payroll deduction method of contribution and remits the contributions to the participating charities. For the participating charities, the Combined Campaign is an efficient and inexpensive method of obtaining contributions and the government's assistance and efforts represent a substantial federal subsidy.

### B. Application of National Black United Fund

The NBUF has been designated a "public charity" under the Internal Revenue Code. As a national voluntary organization and through its affiliates, it seeks to eliminate prejudice and discrimination, reduce neighborhood tensions, relieve the poor and un-

---

4. The Advisory Council has since been abolished but only after the Manual and Combined Campaign mechanisms were in place.

derprivileged and combat community deterioration. It questions and challenges the approach of the United Way and other old-line charities and national voluntary agencies as being unresponsive to the primary needs and concerns of minorities. NBUF regards those agencies as inflexible in their approach to the present problems of the black minority. Thus, in attempting to overcome what was perceived to be a deficiency, the NBUF sought to develop resources and leadership within the minority community itself. Its program objectives are focused in such areas as community economic development, job training and job referral, housing, voter education, community organization and community sponsorship of health, cultural, recreational and charitable activities.

In accordance with the procedure outlined in the Manual, NBUF submitted, in early 1976, an application to the Civil Service Chairman seeking designation as a national voluntary welfare agency. By this means plaintiff sought recognition on its own merits as an independent agency rather than through affiliation with United Way. The application included information on its board of directors and its local chapters. Also included were the relevant required financial information as well as sociological studies and demographic information documenting NBUF's claim that it served a target population which, by virtue of its scope, was not located in all states. Endorsements of the application came from members of Congress and prominent citizens.

The plaintiff's efforts to participate directly in the Combined Campaign were rejected. The rejection was based upon an adverse recommendation by the Eligibility Committee and an independent review by the Chairman that NBUF was not sufficiently national in scope and that its administrative expenses were unreasonably high. In rejecting the application, the Chairman suggested that NBUF negotiate with the United Way to receive funds on the local level as part of a federated fund-raising group activity as opposed to seeking recognition as a national organization. NBUF contended it was a national voluntary agency and sought recognition as such. Viewing a second rejection by the Chairman as a final decision, NBUF sought judicial intervention.

During the pendency of this suit, plaintiff reapplied for recognition as a national voluntary agency for participation in the 1977 Combined Campaign. That request was denied and plaintiff has not applied for participation in subsequent annual campaigns.

### C. Eligibility Criteria

Section 5.1 of the Manual requires that the Chairman establish eligibility criteria for a threefold purpose, to insure that:

a) Only responsible and worthy voluntary agencies are permitted to solicit on the job in Federal installations,

b) The funds contributed by Federal personnel will be used effectively for the announced purposes of the soliciting agency, and,

c) All recognized national agencies have field organizations capable of participating equitably in the joint campaign arrangements required by the Federal program.

To effectuate this mandate a number of specific requirements were promulgated, only two of which were relied upon by the Chairman in rejecting the NBUF.[5] The first is the National Scope requirement, Section 5.24, which provides criteria for determining that an applicant is a national voluntary agency. The second is the Administrative and Fund-Raising Expense requirement, Section 5.34, which provides guidelines for ascertaining that an applicant is a "responsible and worthy voluntary agency."

The two eligibility requirements were recently amended in April of this year.[6] NBUF's application was governed by the requirements in effect at the time it was filed.

---

**5.** The relevant texts of the two requirements are set out at pages 14 and 16, *infra*.

**6.** 45 Fed.Reg. 24955, April 11, 1980.

The National Scope requirement operative at the time of plaintiff's application mandated that an applicant demonstrate that it was "organized on a national scale . . . [and had] earned good will and acceptability throughout the United States." Plaintiff had only 13 chapters, a representation considered insufficient by the Chairman.

The Administrative and Fund-Raising Expense requirement provided that such expenses "must be reasonable" and that those not exceeding 25% of total support and revenue would be so considered. Where expenses exceeded that percentage the burden was on the organization to demonstrate the reasonableness of its expenses.[7]

## II. LEGAL ANALYSIS

### Introduction

■ The NBUF alleges that the Chairman's decision and the eligibility rules upon which that decision is based violate the First Amendment, the Due Process Clause of the Fifth Amendment and the Administrative Procedure Act (APA), 5 U.S.C. § 701, et seq. Plaintiff raises a number of serious questions concerning the operation of the Combined Campaign.[8] The manner in which one charity, United Way, has dominated a federal program is, indeed, quite troubling. However, of greater concern to this Court is the violation of plaintiff's First Amendment rights by virtue of the overbroad application of the eligibility criteria as applied by the Chairman.

Essentially, the plaintiff contends that the national in scope requirement is discriminatory as applied. NBUF serves a minority-beneficiary population and it is an established fact that a significant number of blacks are not found in every state.

While the requirement allows for compliance by a number of alternative methods, the Chairman focused on the location of local chapters to the exclusion of other criteria.

As to the expense requirement, while it does not establish the 25% ceiling as an absolute cut-off point, the Chairman applied it as such without inquiring into the particular circumstances of the NBUF. The Chairman first stated that the Manual provides "that to be eligible for participation an agency's administrative and fund-raising costs should not exceed 25% of total income." However, in later correspondence he explained that the requirement was applied with "some flexibility," finding, however, that NBUF's costs were "significantly higher than the allowed percentage and . . . [were] considered unacceptable, even for a new organization".[9] NBUF contends that, as applied by the defendant, the administrative expense requirement rests on an irrebuttable presumption that a charity with costs above 25% cannot be fiscally responsible and therefore cannot withstand a due process challenge.

In sections A and B, which follow immediately, the constitutional issues will be discussed. Section C includes an analysis of the two requirements and the manner in which they were applied by the Chairman in denying plaintiff's application.

### A. The Constitutionality of the Eligibility Criteria

Prior to the establishment of the Combined Campaign, numerous charitable agencies conducted solicitations of federal employees at their workplace with little government intervention. Section 1.1 of the Manual noted that, "[i]t has long been

---

**7.** Section 5.34 of the regulation was amended in view of *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). The decision is discussed at 9 *infra*.

**8.** Plaintiff's contention that the *establishment* of the Combined Campaign itself is violative of the Constitution because it resulted from an improper delegation of authority is without

merit. *See United Black Fund v. Hampton*, 352 F.Supp. 898, 903 (D.D.C. 1972) (delegation of authority to establish and administer Combined Campaign upheld).

**9.** Letters from Chairman, Civil Service Commission, to NBUF, April 29 and June 24, 1976, AR at 121–22 and 1–2.

Government policy to cooperate with and assist voluntary health and welfare agencies to solicit funds for worthy causes from Federal personnel." In response to and because of the administrative burden imposed by the multiplicity of appeals, the Combined Campaign was established. Thus the government had provided an opportunity for solicitation all along but imposed restrictions on access to that forum to reduce the administrative burden and to ensure the "worthiness" of the solicitors. However, NBUF was denied access to the Campaign because of those restrictions.

Through the Combined Federal Campaign the government has afforded a forum and platform where national voluntary agencies may advance their causes before federal employees and solicit for financial contributions. As a practical matter the Campaign is an advertising and sales campaign directed to government employees urging them to give financial support to a designated group of national charities. This solicitation is in effect a type of speech supported by the government. Likewise, a donation to these charities is an expression of and reflects the interest and preferences of the donor government employee.

■■ Viewed in light of recent rulings there can be little dispute that the Combined Campaign involves First Amendment activities and that high standards of precision and specificity are required and necessary when such fundamental rights are involved. *Hynes v. Mayor of Oradell*, 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976). And, "[w]here a government restricts the speech of a private person, the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." *Consolidated Edi-*

*son Company of New York, Inc. v. Public Service Commission of New York,* —— U.S. ——, ——, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980) (the barring of an electric utility's use of bill-inserts to promote its position on controversial issues of public policy infringes on freedom of speech).

The recent decision of the Supreme Court in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) is dispositive of the First Amendment question here presented. *Schaumburg* involved an ordinance prohibiting door-to-door or on-street solicitation of contributions by charitable organizations that do not use at least 75% of their receipts for "charitable purposes," such purposes being defined to exclude all administrative expenses. A non-profit environmental protection organization was denied a solicitation permit because it could not meet the 75% requirement. Citizens for a Better Environment incurred greater expenses than traditional charities because it used paid solicitors who also functioned as advocates of the organization's cause. The solicitors' salaries were considered "administrative expenses." The Supreme Court held that the ordinance in question was unconstitutionally overbroad in violation of the First and Fourteenth Amendments. The decision rested on a finding that charitable appeals for funds, on the street or door-to-door, involve a variety of speech interests—communication of information, dissemination and propagation of views and ideas, and advocacy of causes—that are within the First Amendment's protection.[10] The Court found that while soliciting financial support is subject to reasonable regulation, such regulation must give due regard to the reality that charitable solicitation is

---

**10.** Defendant and defendant-intervenor contend that this case does not involve the First Amendment conduct addressed in *Schaumburg*. The Court is not persuaded by their reliance upon *Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961), for the proposition that the federal workplace is amenable to the restraints involved in this case. First, *Cafeteria Workers* dealt with the

question of security on a military installation, a situation clearly distinguishable from the case at bar. More important, however, is the purpose of the Combined Campaign and the form of relief requested by NBUF. The summary exclusion of a civilian employee from a military base cannot be the basis for denial of access to a forum for the espousal of speech where such a forum *is* provided.

well within the purview of First Amendment activity.

■ It follows that once the government has created a forum and platform where First Amendment rights may be exercised, it must be an open forum, accessible to all on an equal basis.[11] *Carey v. Brown*, —— U.S. ——, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980) (law which bars all picketing of residences but exempts picketing when related to labor disputes discriminates among speech-related activities on basis of content in violation of Constitution); *Police Department of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (ordinance barring picketing near schools but exempting picketing relating to labor disputes makes impermissible distinction between speech-related activities in violation of Constitution); *Williams v. Rhodes*, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (voiding a statute that gave established political parties a decided advantage over newly organized parties—thus placing unequal burdens on the right to associate).

## B. Constitutionally Permissible Regulation

■ Although regulation of activity in the federal workplace geared to "efficacious administration of governmental programs is not without some importance . . . 'administrative convenience' is not a shibboleth, the mere recitation of which dictates constitutionality." *Frontiero v. Richardson*, 411 U.S. 677, 690, 93 S.Ct. 1764, 1772, 36 L.Ed.2d 583 (1972). Constitutionally permissible regulation which imposes limitations on First Amendment protected speech must fall within one of three areas: 1) reasonable time, place or manner restrictions; 2) permissible subject-matter regulation; or 3) a narrowly tailored means of serving a compelling state interest. *Consolidated Edison*, —— U.S. at ——, 100 S.Ct. at 2327. Defendants contend the regulations here fall into the third category. However, the broad application of these regulations belies this contention. In this instance, the regulation must be drawn with "narrow specificity," *Hynes v. Mayor of Oradell*, 425 U.S. at 620, 96 S.Ct. at 1760, and *applied* narrowly to serve the proper governmental interest in confining solicitation privileges to "worthy," "national" agencies without "interfering with First Amendment freedoms." *Id.*

Such narrow application should serve to avoid another problem made particularly clear by United Way. On page 5 of its opposition to plaintiff's motion for summary judgment United Way states:

> [O]n-the-job solicitations of Federal employees should not be a testing ground for new and unproven charitable organizations but should be confined to organizations that have first demonstrated substantial public support through fund-raising success other than through the CFC and an acceptable level of efficiency in providing direct services to persons served.

If in fact the Chairman and the Eligibility Committee were pursuing this course in denying admission to NBUF, and from every indication they were, then there was indeed a clear First Amendment violation. As Justice Marshall stated in *Police Department of Chicago, supra*, 408 U.S. at 96, 92 S.Ct. at 2290:

> involved a question of "guaranteed access" when the city banned *all* political advertisements in the transit system because the nature of the system as a business venture with a captive audience belied Lehman's contention that the system constituted a public forum. On the other hand, NBUF presents the Court not with a question of guaranteed access to a forum denied to all, across-the-board, but rather, of equal access to solicit within the federal workplace where such solicitation *is* permissible and a First Amendment forum *is* provided.

11. This case involves equal access to a forum, unlike *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) upon which defendants rely. In *Lehman*, plaintiff sought to advertise for his political campaign on city transit busses. The denial of his request was upheld by the Court on the grounds that the denial of *all* political advertising was a business decision made by the government in its proprietary capacity. The analysis undertaken by the Court reflects the clear differentiation between the facts in *Lehman* and the case at bar. *Lehman* necessarily

[U]nder the . . . First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. *And it may not select which issues are worth discussing or debating in public facilities.* There is an "equality of status in the field of ideas," and *government must afford all points of view an opportunity to be heard.* (Citation omitted.) (Emphasis added.)

*See also Carey v. Brown,* —— U.S. at ——, 100 S.Ct. at 2289. The regulation must ensure that individuals are not empowered with determining the "worthiness" of a particular cause. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed 1213 (1940).

Defendants posit two possible alternatives to NBUF's participation in the Combined Campaign: secure employee contributions through solicitations in the lobby of the particular government agency, or, participate as an affiliate of the United Way. The proposed alternatives are not acceptable. Lobby solicitations were recognized as inadequate and unsatisfactory by the government some time ago. Additionally, payroll deductions are not available to an organization which solicits in lobby campaigns. As to affiliation with the United Way the plaintiff contends that such a move would be counter-productive to its goals and purposes. NBUF advances the argument—which has considerable merit—that its goals, priorities and emphasis are focused on programs designed to combat prejudice and discrimination, whereas the United Way's emphasis is upon old-line organizations and programs which, although of unquestionable merit and worth, fail to address and concern the basic and central economic and social problems ever present in a minority community. Beyond that, the plaintiff correctly points out that the important legal question is whether the alternatives are "effective," *Healey v. James,* 408 U.S. 169, 181–83, 92 S.Ct. 2338, 2346–2347, 33 L.Ed.2d 266 (1972), which in this case they are not.

Furthermore, the fact that NBUF may utilize lobby solicitations or affiliate with United Way cannot justify a curtailment or denial of its advocacy and quest for charitable funds through the Combined Campaign. *See Southeastern Promotions Ltd. v. Conrad,* 420 U.S. 546, 556, 95 S.Ct. 1239, 1245, 43 L.Ed.2d 448 (1975); *Spence v. Washington,* 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed 155 (1939).

### C. The National in Scope and the Expense Requirements

#### 1. National Scope

The plaintiff's argument that the national in scope requirement as interpreted and applied violates the Due Process Clause of the Fifth Amendment and the First Amendment is not, as suggested by the defendants, entirely without substance.

Executive Order 10927 and the Combined Federal Campaign grew out of several legitimate governmental concerns, namely, to protect federal employees from coercive solicitation practices, and to limit the number and duration of charitable solicitations on government time.

Executive Order 10927 and its predecessor, Executive Order 10728, were designed to bring order into a chaotic fundraising situation within the Federal Government. Prior to these Orders, many individual charitable organizations were soliciting in Federal installations at many different times during the year. These agencies met no particular standards of integrity or financial or program accountability. It was considered necessary, therefore, to develop a system under which solicitations could be conducted with a minimum interruption of Government functions and to assure that the agencies allowed solicitation privileges met reasonable standards of financial and program integrity and accountability.[12]

---

**12.** Affidavit of George J. McQuoid, Executive Director of and Assistant to the Chairman of the Civil Service Commission, August 24, 1976.

Section 5.24 of the Manual requires that a voluntary agency in order to participate in the campaign as a national voluntary agency must demonstrate that

* * *

a. It is organized on a national scale with a national association which is representative of its constituent parts and which, through its board of directors, exercises close supervision over the operations and fund-raising policy of any local chapters or affiliates.

b. [It has] earned good will and acceptability throughout the United States, particularly in cities or communities within which or nearby are Federal offices or installations with large numbers of personnel.

Good will and acceptability will usually be shown by operating chapters providing service in all or most of the states, with contributor support from all or most parts of the nation. Good will and acceptability throughout the United States will also be demonstrated by other means, such as the extent of support received from the public, the number and location of contributors, the national character of campaigning directed to the public, the reputation of the organization on a national basis, and the proportionate effect on total income of the organization's participation in the Federal program. In the case of international agencies, chapter or affiliate coverage in all or most states need not exist.[13]

■■■ The purpose behind Section 5.24 is to ensure that "only reasonable and worthy voluntary agencies are permitted to solicit on the job in Federal installations." The Chairman interpreted the requirement to mean that in order to qualify for participation an organization must maintain chapters in all or nearly all states. Because the NBUF did not maintain chapters in every city where there was a federal agency, its application was rejected by the Chairman.

Rejection on that basis can scarcely escape the challenge that it unlawfully and impermissively discriminated against the NBUF on the basis of race. Based on well known and undisputed demographic facts, the black population is unevenly distributed and it is impossible for NBUF to have a chapter in all, or even a majority, of the states. The same would be true of the American Indian, Hispanic, East Asian or any other minority ethnic organization concerned with issues similar to those of the plaintiff. Such organizations could never demonstrate goodwill, and general acceptability throughout, carry on a nationwide program or otherwise qualify for participation because those minorities, like blacks, are concentrated in only a few cities and states.

■■■ The Chairman's limited interpretation and focus on the national in scope requirement also failed to acknowledge and to credit other factors which he was obligated to recognize in determining the acceptability and worth of the NBUF. Section 5.24 for example recognizes the extent of the organization's public support, the number and location of contributors, the national reputation of the organization. The Chairman only relied upon the number and location of local chapters. While other data to support the extent and scope of its nationwide operations were submitted, there is no indication that they were given proper consideration. Since the reasons advanced by the Chairman do not comport with the established and declared standards and criteria, the rejection of the NBUF application cannot be sustained. *See Camp v. Pitts*, 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1972); *SEC v. Chenery*, 332 U.S. 194, 197, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).[14]

■■■ The National Scope requirement is acceptable as written. However, as interpreted and applied, the requirement was arbitrary, unreasonable, unduly restrictive and bore no rational relation to any legiti-

---

**13.** The 1980 Amendments do not change the operative language of this section. See 45 Fed. Reg. 24959–60.

**14.** The denial of plaintiff's application is contrary to the evidence and violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(B).

mate interest and served to discriminate against the NBUF, a new organization, in favor of more established charities. The Fifth Amendment proscribes such discrimination and also protects the plaintiff's interest in participating in the Combined Federal Campaign. The Constitution protects not only rights which a person presently has in hand but also those rights which a person is entitled to possess. *See Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *see also Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). And once a benefit has been made available by the government it must be made available to all under like circumstances. *See Bell v. Burson*, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

## 2. Administrative and Fund-Raising Expense

Section 5.34 of the Manual provides in part that:

> Expenditure for administration and fund raising not exceeding 25% of total support and revenue will be considered reasonable. Where . . . expense exceeds this percentage, the burden is on the voluntary organization to demonstrate the reasonableness of its . . . expenses under all the circumstances in its case.[15]

As noted, the administrative expense requirement establishes a presumption which is explicitly rebuttable, placing the burden on the applicant "to demonstrate the reasonableness" of its expenses. However, as applied, the requirement has served to preclude participation in the Combined Campaign by agencies with expenses which exceed 25% by any but a negligible amount.[16] Thus, although valid on its face, the requirement is applied in a manner which sweeps quite broadly, precluding participation by organizations well within the proper purpose of the Combined Campaign. This practice served to exclude the plaintiff arbitrarily. As noted in *Schaumburg*, while a 25% limitation was enforceable against "more traditional charities," an identifiable class of organizations exists as to which such a limitation would be "an unjustified infringement of the First and Fourteenth Amendments." 100 S.Ct. at 835–36. NBUF is within that class.

While it is undisputed that regulation of solicitation serves legitimate interests of the government in "preventing fraud," 100 S.Ct. at 836, the practice of establishing a cut-off at the 25% level of the expenses versus total income cannot stand. The government's contention that the requirement serves only as a guideline is contrary to the evidence. While a 25% guideline is permissible where applicants may show that expenses in excess of the guideline are reasonable, *National Foundation v. Forth*

---

**15.** As amended, § 5.34 still establishes a presumption of reasonableness at the 25% level of expenses. However, the amendment sets forth "[c]ircumstances which could demonstrate the reasonableness of administrative and fund-raising expenses" which are in excess of 25%, particularly:

    a. Newly established agencies which can demonstrate the likelihood of reducing their administrative and fund-raising expenses to a reasonable level within a reasonable period.
    b. Older agencies which can demonstrate that the impact of CFC contributions on their administrative and fund-raising costs is likely to bring those expenses to within a reasonable level.

45 Fed.Reg. 24952, 24960.

According to the amendment, the above list is illustrative rather than inclusive.

**16.** For example, in its March 1976 Report, the Committee on Eligibility recommended acceptance of applications from two organizations with expenses in excess of 25%, namely, the March of Dimes which spent 26.9% on administrative and fund-raising expenses and the Arthritis Foundation with expenses of 27.7% of total income. Such acceptance was recommended with the caveat that expenses should be lowered or future applications may be denied. AR at 326. In its April 1976 Report, the Committee approved the two applications stating that although their expenditures "are *slightly* higher than the 25% *limit*" the applications should be approved, but that "if they do not meet the criteria next year, appropriate consideration will be given by the Committee to a recommendation for non-renewal of fund-raising privileges." (Emphasis added.)

*Worth,* 415 F.2d 41 (5th Cir. 1969), *cert. denied,* 396 U.S. 1040, 90 S.Ct. 688, 24 L.Ed.2d 684 (1970), it is clear that such is not the practice here.[17] The Citizens-plaintiff in *Schaumburg* claimed that because of the nature of their organization and its role as an advocate, it necessarily incurred greater expenses than a traditional charity. So too, NBUF contends that for a number of reasons—the expense of soliciting from minority populations and the additional expenses incurred during the initial phases of the establishment of a network of local charitable agencies providing direct services to local communities in non-traditional as well as traditional charitable areas—it also will spend greater amounts on administrative expenses than would a charity which only dispenses services directly to the needy.

Given the plaintiff's Fifth Amendment interest and the First Amendment activity involved, the Chairman's application of the 25% "guideline" as an irrebuttable presumption violates the Due Process Clause of the Fifth Amendment. It is clear from the evidence presented that expenses in excess of 25% may indeed be reasonable. Thus, the Chairman's application of a presumption which is not "necessarily or universally true in fact," *Vlandis v. Kline,* 412 U.S. 441, 452, 93 S.Ct. 2230, 2236, 37 L.Ed.2d 63 (1973), infringes upon the First Amendment rights of the charitable organizations subjected to that presumption and violates the Due Process Clause of the Fifth Amendment.

### CONCLUSION

Denial of the National Black United Fund's application to participate in the Combined Federal Campaign was improper and contrary to law. Although the applicable portions of the Manual have been amended since defendant's denial of plaintiff's application, those amendments would

not necessarily require a different result than was reached by the Chairman here. Essentially the same criteria govern the National Scope determination (Section 5.24 of the Manual) and, while an organization with administrative expenses in excess of 25% may be admitted under the amended Fund-Raising Expense requirement, that percentage is still the maximum considered to be "reasonable." 45 Fed.Reg. 24960. The Court finds this presumption invalid.

The eligibility requirements for participation in the Combined Campaign, as interpreted and applied, violated the First and Fifth Amendment rights of the National Black United Fund. The Fund is entitled to appropriate declaratory or injunctive relief. An appropriate judgment and order will be entered consistent with the findings and conclusions set forth in this Memorandum Opinion.

July 1, 1980

### APPENDIX A

### EXECUTIVE ORDER

### 10927

### ABOLISHING THE PRESIDENT'S COMMITTEE ON FUND–RAISING WITHIN THE FEDERAL SERVICE AND PROVIDING FOR THE CONDUCT OF FUND–RAISING ACTIVITIES

By virtue of the authority vested in me as President of the United States, it is ordered as follows:

Section 1. The President's Committee on Fund-Raising Within the Federal Service, established by Executive Order No. 10728 of September 6, 1957, is hereby abolished, and that order is hereby revoked.

Section 2. (a) The Chairman of the Civil Service Commission shall make arrangements for such national voluntary health and welfare agencies and such other nation-

---

**17.** The recent amendment does not alter this analysis. Rather it illustrates that, while organizations may be admitted to the Combined Campaign notwithstanding excess expenditures, future participation will depend upon a reduction of expenses to within the 25% limit.

This amendment merely codifies what is apparently a long standing practice. Said practice is precisely the activity before this Court for review. *See* footnote and accompanying text at 753 *supra.*

al voluntary agencies as may be appropriate to solicit funds from Federal employees and members of the armed forces at their places of employment or duty stations.

(b) In making the arrangements required by subsection (a) of this section, the Chairman of the Civil Service Commission is authorized to consult with appropriate interested persons and organizations, the national voluntary agencies, and the executive departments and agencies concerned. Such arrangements shall (1) permit true voluntary giving and reserve to the individual the option of disclosing his gift or keeping it confidential; (2) designate specific periods during which solicitations may be conducted; and (3) provide for not more than three solicitations annually, except in cases of emergency or disaster appeals for which specific provision may be made by the Chairman of the Civil Service Commission.

Section 3. This order shall not apply to solicitations conducted by organizations composed of civilian employees or members of the armed forces among their own members for organizational support or for benefit or welfare funds for their members. Such solicitations shall be conducted under policies and procedures approved by the head of the department or agency concerned.

Section 4. All records and property of the President's Committee on Fund-Raising Within the Federal Service are hereby transferred to the Chairman of the Civil Service Commission.

Section 5. This order shall become effective forty-five days after its date.

THE WHITE HOUSE

March 18, 1961.

JOHN F. KENNEDY