**NATIONAL BLACK UNITED FUND, INC.,**

v.

**Donald J. DEVINE, Director, United States Office of Personnel Management, United Way of America, Appellant.**

**No. 80–2101.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 27, 1981.
Decided Oct. 20, 1981.

John S. Koch, Washington, D. C., with whom Patricia A. Barald and John G. Buchanan, III, Washington, D. C., were on brief for appellant.

Stephen J. Dutton, Indianapolis, Ind., with whom Phillip A. Terry, Indianapolis, Ind., was on brief for appellee, Nat. Black United Fund, Inc.

Charles F. C. Ruff, U. S. Atty., Kenneth M. Raisler and Dennis A. Dutterer, Asst. U. S. Attys., Washington, D. C., entered appearances for appellee, Donald J. Devine, Director, U. S. Office of Personnel Management.

William L. Robinson, Norman J. Chachkin, New York City, Beatrice Rosenberg, Lezli Baskerville, Washington, D. C., and Charles Stephen Ralston, New York City, were on brief for amicus curiae, Nat. Committee for Responsive Philanthropy urging affirmance.

Before BAZELON, Senior Circuit Judge, and MacKINNON and GINSBURG, Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

In 1961, President Kennedy ordered the Civil Service Commission ("Commission") to organize the various charity drives held at federal workplaces into a coordinated, unified campaign.[1] The Combined Federal Campaign ("CFC" or "campaign"), under the supervision of the Commission, has since become an invaluable source of support for participating charities.[2] Furthermore, as the exclusive vehicle for on-the-job charita-

---

1. Executive Order No. 10927 (March 18, 1961). Section 2(b) of the Order required the Commission to "(2) designate specific periods during which solicitations may be conducted; and (3) provide for not more than three solicitations annually . . . ." The regulations implementing the Order permit approved charities to conduct separate fund-raising campaigns at some installations, *Manual on Fund-Raising Within the Federal Service For Voluntary Health and Welfare Agencies* ("Manual") §§ 1.5, 3.3 (Feb. 1973), but require charities to consolidate their efforts into a single fall campaign in all cities with more than 200 employees. *Manual* § 1.54. In this case, we are concerned only with this combined campaign.

2. The CFC has been especially valuable to the members of appellant United Way of America. In 1975, the CFC raised $65.8 million. Approximately 70% of those funds were allocated to local federations recognized by the United Way. *See* pp. 175–176 *infra.* In the District of Columbia, the CFC contributed over 44% of United Way's total receipts that year. *See* Joint Appendix ("J.A.") 27–28.

ble solicitation, it has substantially reduced the disruption caused by multiple, uncoordinated fund drives carried on in the federal workplace by individual charities.

In this action, appellee National Black United Fund ("NBUF") a voluntary welfare organization, contends that the success of the CFC has been achieved in part at the expense of First Amendment freedoms. Specifically, appellee challenges the Commission's rejection of NBUF's application to participate in the campaign as a "national voluntary agency." Appellee argues that the Commission's decision unconstitutionally prevented NBUF from expressing its views in a "public forum." The district court granted NBUF's motion for summary judgment. We conclude that the district court erred in finding a First Amendment violation on the record now before us. Accordingly, we reverse and remand.

## I. BACKGROUND

### A. The Administrative Structure

The CFC is conducted annually at over 500 federal installations across the country. Selected government employees, known as "keymen," distribute pamphlets containing brief descriptions of particular charities to their fellow workers. Most donors contribute through payroll deductions. In addition to permitting its employees to organize and promote the CFC at federal offices, the government assumes the expense of collecting and distributing the funds. At the time of the events underlying this case, the Chairman of the Commission was responsible for supervising the campaign[3] and had promulgated regulations under that authority.[4]

The regulations, consistent with the Executive Order authorizing the CFC,[5] limit federal solicitation privileges to "national voluntary agencies."[6] At the time of NBUF's application, several organizations concerned with health, emergency relief, and international service had satisfied the criteria for this status.[7] These groups participate in the CFC in any community in which they are active and are represented on the CFC Advisory Council according to their field of endeavor.[8] Local CFC organizers distribute to these groups all funds specifically designated for them by donors as well as a share of all undesignated funds.

Although the Executive Order and the regulations contemplate solicitation by agencies, like NBUF, that operate in the field of "welfare," no such organizations had been approved as "national voluntary agencies" when NBUF first approached the Commission. *Local* welfare charities never-

---

3. As part of the reorganization of the Civil Service system, the Chairman's authority over the CFC was transferred to the Office of Personnel Management. Reorganization Plan No. 2 of 1978, § 102, 43 Fed.Reg. 36037 (Aug. 15, 1978); Civil Service Reform Act of 1978, Pub.L. No.95–454, 92 Stat. 1111. Under Rule 25, Fed. R.Civ.P., the district court substituted Alan K. Campbell, Director, Office of Personnel Management, as a party defendant. *National Black United Fund, Inc. v. Campbell*, 494 F.Supp. 748, 751 n.1 (D.D.C.1980) (hereinafter cited as "District Court opinion").

4. *See* note 1 *supra.* The regulations that appear in the 1973 *Manual* were in effect at the time of the events underlying this case. In April 1980, the Office of Personnel Management modified the rules in several significant respects. *See* 45 Fed.Reg. 24952 (April 11, 1980). We will refer in this opinion to the regulations as they existed in 1975 and 1976.

5. *See* note 1 *supra.* The Order states: "The Chairman of the Civil Service Commission shall make arrangements for such national vol-

untary health and welfare agencies and such other national voluntary agencies as may be appropriate to solicit funds from Federal employees and members of the armed forces at their places of employment or duty stations."

6. *See Manual* § 1.5.

7. These included the American National Red Cross, the American Cancer Society, the American Heart Association, CARE, and Project HOPE. *Manual* § 3.1.

8. The Advisory Council is a four-member group appointed by the Chairman "to assist and advise him in the development of policies, procedures, and eligibility requirements." *Manual* § 2.12. The regulations provide that membership shall consist of the Presidents of the Red Cross and of the United Way of America, Inc., and the Presidents of a "national health agency" and of an "international agency" on a rotating basis. *Id.*

theless solicited in the CFC through a special arrangement with the United Way of America ("UWA"), appellant in this action. The regulations exempt from the normal requirements for participation all "local community chests or united funds which are members in good standing of, or are recognized by, the United Way of America."[9] Welfare organizations can apply for membership in these private federations and, if accepted, be listed under the United Way "umbrella" in CFC pamphlets. As with national agencies, charities participating through this route receive all funds specifically earmarked for them directly from the local CFC organizers. *Undesignated* funds, however, are first divided among the national agencies and the United Ways. The United Ways then divide their share of undesignated funds among their respective members.

Thus, as long as no other welfare agencies satisfied the requirements for "national" status, the CFC delegated to UWA and its member agencies the responsibility for reviewing the legitimacy of all would-be participants in the field of welfare.[10] This arrangement was apparently intended to permit CFC participation by local welfare agencies without imposing too great an administrative burden on federal officials. Judge Gasch explained the rationale in an opinion upholding the delegation to UWA:[11]

> Rather than have federal officials pass on every application of the thousands of local health and welfare agencies in communities across the nation, the Chairman has provided that such applications be screened by a community chest or united fund in every community where such an organization exists. To further facilitate efficient planning, he has provided that the chests or funds themselves be screened by United Way.

*United Black Fund, Inc. v. Hampton*, 352 F.Supp. 898, 904 (D.D.C.1972).

### B. *Proceedings Below*

In 1976, NBUF applied to the Commission for status as a "national voluntary agency" in the field of welfare. The Commission rejected NBUF's application on the grounds that appellee failed to satisfy the Commission's "national-in-scope" requirement[12] and administrative expense limita-

---

**9.** *Manual* § 5.4. Although these local groups are autonomous and employ different names, we will refer to them herein as "United Ways" for convenience. We will call the parent organization, United Way of America, Inc., either "UWA" or appellant.

**10.** UWA's status as a surrogate "national voluntary agency" for welfare is confirmed by its guaranteed seat on the Advisory Council, along with the other national agencies. *See* note 8 *supra.*

**11.** Judge Gasch noted that the Commission retains ultimate responsibility for admission to and administration of the CFC. 352 F.Supp. at 904. The district court in this case also sustained the delegation, District Court opinion, 494 F.Supp. at 754 n.8, and NBUF does not challenge that determination on appeal.

**12.** Section 5.24 of the *Manual* requires that the applicant demonstrate that it is "national-in-scope" by showing that

> it has earned good will and acceptability throughout the United States ... by operating chapters providing service in all or most of the states, with contributor support from all or most parts of the nation. Good will and acceptability throughout the United

States will also be demonstrated by other means, such as ... the reputation of the organization on a national basis.

The Commission concluded that NBUF did not satisfy this requirement. It cited NBUF's relatively few chapters (13), J.A. 100, and its lack of "widespread contributor support," J.A. 78. (Virtually all of NBUF's funds came from a limited number of grants.)

The district court concluded that the Commission's application of the "national-in-scope" criteria constituted an overly-broad means of achieving the government's legitimate purpose of insuring that "only reasonable and worthy voluntary agencies are permitted to solicit on the job in Federal installations." District Court opinion, 494 F.Supp. at 758, *quoting Manual* § 5.1(a). The court found (a) that the Commission's requirement that an agency have chapters in "all of most of the states" discriminated against groups like NBUF serving minority populations concentrated in a few geographic areas and (b) that the Chairman impermissibly failed to consider other factors relevant to NBUF's level of national support. District Court opinion, 494 F.Supp. at 758. For reasons explained *infra*, we find it unnecessary to review this analysis.

tion.[13] In his letter denying the application, the Chairman of the Commission suggested that NBUF make arrangements to participate through local United Ways in communities with NBUF chapters. NBUF, believing that the United Ways do not satisfactorily meet the needs of minority communities, rejected this alternative.[14]

After the Chairman declined NBUF's request to reverse his decision, appellee brought this action in district court and appellant intervened. The court concluded

that the denial of "national" status substantially impaired NBUF's First Amendment rights by prohibiting the organization's protected speech in a "public forum." [15] Furthermore, the court decided that the "national-in-scope" and administrative expense requirements were not narrowly tailored to serve strong governmental interests.[16] The court therefore held that the national status criteria, as applied to NBUF, violated the First Amendment and ordered the Commission to reconsider appellee's application.[17] This appeal followed.[18]

**13.** Section 5.34 of the *Manual* requires that administrative and fund-raising expenses be "reasonable," and that an applicant with administrative expenses in excess of 25% of total revenue carry the burden of proving the reasonableness of such expenditures. The Commission found that NBUF's administrative expenses exceeded 54%. J.A. 79.

The district court found as a fact that the Commission applied the 25% limit inflexibly and therefore violated the First Amendment standards outlined in *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980). *See* District Court opinion, 494 F.Supp. at 759–60. As with the court's consideration of the "national-in-scope" requirement, we find no need to evaluate this conclusion. *See* pp. 180–181 *infra*.

**14.** Appellant suggests that NBUF's complaint should have been dismissed for failure to exhaust administrative remedies since NBUF did not pursue the "local" route to CFC participation. We do not believe that this omission, standing alone, warranted dismissal. The exhaustion doctrine does not require resort to "remedies" incapable of vindicating the claimed right. NBUF claims that only approval as a "national" agency will satisfy its protected interests. While appellee undoubtedly could have developed a record for its claim by seeking affiliation with local United Ways, it need not have done so if it could prove that route would impair its First Amendment rights. *Cf. Grace v. Burger*, 665 F.2d 1193, at 1196–1197 (D.C.Cir. 1981) (claimant not required to pursue unconstitutional administrative alternative). *See also Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Appellant seems to acknowledge as much. *See* Brief for Appellant at 43–44. Thus, whether or not we employ the term "exhaustion," the question before us is the same: Did NBUF demonstrate that relegation to "local" status violated the First Amendment? *See also Fuentes v. Roher*, 519 F.2d 379, 387 (2d Cir.1975) (exhaustion inapposite "where the question of the adequacy of the administrative remedy is for all practical

purposes coextensive with the merits of the plaintiff's constitutional claim.")

*United Black Fund v. Hampton*, 352 F.Supp. 898 (D.D.C.1972), cited by appellant, is consistent with this analysis. In that case, a local federation of charities sought solicitation status equal to the community United Way. The Commission rejected the application, indicating that only one organization was permitted to act as an "umbrella" for community charities in any given locale. The court suggested that if the plaintiff's only objective had been to acquire solicitation privileges for its *member* charities, its complaint would be dismissed since it had not sought privileges *within* the local federation either for its individual members or for itself as their representative. Because plaintiff claimed a right to solicit *alongside* the United Way as a separate federation of charities, however, it was entitled to challenge the Commission's final decision to deny plaintiff that status. *Id.* at 902.

Similarly, appellee in this case claims a right to participate as a "national" agency unless its rejection is strictly justified. *See* p. 180 *infra*. The Commission has definitively rejected NBUF's contention that only the award of "national" status will satisfy the First Amendment. Accordingly, we must evaluate the legal and factual sufficiency of appellee's claim.

**15.** District Court opinion, 494 F.Supp. at 755–56.

**16.** *See* notes 12 & 13 *supra*.

**17.** District Court opinion, 494 F.Supp. at 751, 760.

**18.** The government did not appeal the decision below. NBUF contends that appellant UWA lacks an appealable interest. Appellant entered the litigation as an intervenor as "of right" pursuant to Fed.R.Civ.P. 24(a). In view of appellant's obvious interest in the administration of the CFC, *see* note 2 *supra*, we find NBUF's contention to be without merit. *See Bryant v. Yellen*, 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980).

## II. DISCUSSION

Appellant contends that the district court erred both (i) in judging the Commission's decision according to strict First Amendment standards, and (ii) in concluding that the denial of "national" status substantially impaired NBUF's protected interests. We will consider these arguments in turn.

### A. *The Standard of Review*

Charitable solicitation undoubtedly furthers interests protected by the First Amendment. The Supreme Court has noted that "solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and ... without solicitation the flow of such information and advocacy would likely cease." *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 632, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1980). Although *Schaumburg* involved door-to-door solicitation, and oral communication, the written message in the CFC pamphlets also advances protected speech and associational interests. *See Heffron v. International Society for Krishna Consciousness, Inc. ("ISK-CON")*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298 (1981); *Consolidated Edison Co. v. Public Service Commission*, 447 U.S. 530, 535, 100 S.Ct. 2326, 2331, 65 L.Ed.2d 319 (1980).

Appellant nevertheless contends that any access to the CFC is "by executive grace" and therefore can be denied or abridged as long as the Commission's decisions are not "arbitrary or capricious." Reply Brief for Appellant at 12. In support, appellant relies on the so-called "non-public forum" cases in which the Supreme Court allowed government broad discretion to prohibit expressive activities that would interfere with the proper functions of public facilities.[19] Appellee responds that the creation of the CFC converted the federal workplace into a "public forum," at least for purposes of charitable solicitation.

 We find it unnecessary to determine whether or not the CFC constitutes a "public forum." Cases employing that term establish the limits of government's power to bar speech-related activities entirely from public places.[20] If permitting a particular form of expression would substantially disrupt the legitimate functions of a public facility, such expression may be prohibited.[21] If, on the other hand, the property's functions, either by tradition[22] or design,[23] include serving as a platform for expressive activities, the government may not restrict speech on the premises except pursuant to reasonable time, place and manner regulations.

It may be that the impact of charitable solicitation on the proper functions of the federal workplace would justify the government in completely prohibiting such activity in its offices. With the creation of the CFC, however, the Commission has permitted some charities to engage in precisely the sort of "speech" that NBUF wishes to practice. The government thus cannot claim that appellee's desired "manner of expression is basically incompatible with the normal activity" of the federal workplace. *See Grayned v. City of Rockford*, 408 U.S. 104, 116, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972).

---

19. *E.g., United States Postal Service v. Council of Greenburgh Civic Associations*, 453 U.S. 114, 101 S.Ct. 2676, 69 L.Ed.2d 517 (1981) (upholding statute prohibiting the deposit of unstamped "mailable" matter in officially approved mailboxes); *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 557 (1977) (upholding prison regulation prohibiting various speech-related activities by inmates); *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (upholding regulation prohibiting all political speeches on a federal military base).

20. *See Consolidated Edison Co. v. Public Service Commission, supra*, 447 U.S. at 539, 100 S.Ct. at 2334.

21. See cases cited in note 19 *supra*.

22. *E.g., Shuttlesworth v. Birmingham*, 394 U.S. 147, 152, 89 S.Ct. 935, 939, 22 L.Ed.2d 162 (1969).

23. *E.g., Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555, 95 S.Ct. 1239, 1244, 43 L.Ed.2d 448 (1975).

In contrast to the "public forum" cases, then, this case does not require us to evaluate the government's power to deny access to a public facility. Instead, we are faced with a claim that government has treated would-be speakers unequally. *See Perry Local Educators' Association v. Hohlt*, 652 F.2d 1286, at 1293 (7th Cir., 1981), slip op. at 13. Such a claim implicates the First Amendment's fundamental requirement that government observe total impartiality with respect to viewpoints expressed in the "marketplace of ideas." [24] The obligation of content-neutrality can be violated, of course, as much by "amplifying favored or neutral speech [as by] stifling the disfavored." *Id.* at 1294. The CFC clearly provides *some* charities with a substantial opportunity to publicize their views,[25] it thus poses the threat of government "amplifying" some ideas at the expense of others. *See Police Department of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972).

That possibility does not, however, compel strict scrutiny of every Commission decision. NBUF acknowledges that the Commission's regulations, on their face and as applied, are designed to serve content-neutral interests. *See* p. 176 *supra.* Regulations intended to serve interests unrelated to the suppression of speech are evaluated by considering the importance of the government's goals, the means it uses to achieve the goals, and the incidental effect of the regulations on free speech. *See United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968); *Konigsberg v. State Bar of California*, 366 U.S. 36, 50–51, 81 S.Ct. 997, 1006–1007, 6 L.Ed.2d 105 (1961). The level of justifica-

tion demanded for a particular regulation depends on the degree to which the rule inhibits expression. Thus, a regulation that "leave[s] open ample alternative channels for communication of the information," *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976), need only "reasonably" further legitimate interests. Such a rule is often labeled a "time, place and manner regulation." *See, e.g., ISKCON, supra,* 452 U.S. at 647, 101 S.Ct. at 2563. A rule that substantially impairs the ability of certain groups to convey their message to a desired audience, on the other hand, effectively "abridges speech" even if it is not intended to curtail public debate. *See, e.g., Martin v. Struthers*, 319 U.S. 141, 145–46, 63 S.Ct. 862, 864, 87 L.Ed. 1313 (1943). Government must bear a far heavier burden of justification for such a rule. Its content-neutral interests must be "compelling" and it must demonstrate the absence of any "less drastic means" for achieving its purposes. *E.g., Consolidated Edison Co. v. Public Service Commission, supra,* 447 U.S. at 540, 100 S.Ct. at 2334; *Shelton v. Tucker*, 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). *See also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 524, 101 S.Ct. 2882, 2901, 69 L.Ed.2d 800 (1981) (Brennan, J., concurring in the judgment). *See generally* L. Tribe, American Constitutional Law § 12–20 at 683–87 (1978).

Thus, constitutional review of the "national" status rules must begin by considering the impact of the Commission's decision on NBUF's ability to communicate its message. We turn to a review of the district court's conclusions on that question.

---

**24.** *See Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting).

**25.** As Judge Gesell pointed out in another case challenging the regulations of the CFC:

[T]he participating organizations are afforded favorable publicity concerning their objectives and the money received may be used in some instances for activity that falls squarely within the First Amendment. [B]y providing organizations the opportunity to participate in the CFC, the government has, in effect, provided a billboard or channel of communication through which organizations can disseminate their appeals to federal workers. This process has proven extremely effective in raising charitable contributions.

*NAACP Legal Defense and Education Fund, Inc. v. Campbell*, 504 F.Supp. 1365, 1367 (D.D. C.1981).

### B. *"National" Status and NBUF's Protected Interests*

NBUF contends that the denial of "national" status substantially impaired its ability to convey its charitable message to federal employees. The district court agreed, concluding that participation through a local United Way offered an inadequate alternative.[26] Appellant, in contrast, contends that NBUF was merely directed to "another entrance" to the CFC through which it could have engaged in its desired "speech" without inhibition.

Had NBUF solicited through local United Ways, it would apparently have had access to the same audience.[27] And although the context may give meaning to the expression, *see Tinker v. Des Moines School District*, 393 U.S. 503, 513, 89 S.Ct. 733, 740, 21 L.Ed.2d 731 (1969), appellee did not show that its pamphlet message would convey a different meaning if it were listed with a local affiliate of UWA. Nevertheless, NBUF maintains that "differences in the philosophies of the United Way and NBUF" would require NBUF to "change its program" if it participated as a local agency. Brief for Appellee at 38.

While we are not insensitive to the importance of associational freedom, NBUF provided little evidence, and no specific prediction, of how its activities would be affected by affiliation with the local United Ways. *Cf., Kusper v. Pontikes*, 414 U.S. 51, 57–58, 94 S.Ct. 303, 307–308, 38 L.Ed.2d 260 (1973). The district court accepted appellee's assertion that the United Ways emphasize charities that "fail to address and concern the basic and central economic and social programs ever present in a minority community."[28] However, the record before the court on cross motions for summary judgment contains little support for this conclusion.[29] Indeed, there is evidence that many local federations provide substantial funds to minority-oriented organizations and that agencies with goals similar to NBUF's have been able to participate through United Ways with no apparent impact on their message or their program.[30] The court could not properly award summary judgment without resolving this question of fact.

We therefore have no need to review the court's conclusion that the criteria for "national" status did not serve compelling state interests through the most narrowly-tailored means.[31] The judgment is reversed

26. District Court opinion, 494 F.Supp. at 757.

27. The regulations limit the participation of all recognized "national voluntary agencies" concerned with domestic matters to communities in which the organizations are active or have a chapter. *Manual* § 4.2(b). Apparently, therefore, NBUF would appear on CFC pamphlets in the same locations regardless of the form of its participation. For this reason, NBUF's reliance on *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939) is misplaced. In *Schneider*, the Court struck down regulations that limited access to *all* the streets and alleys of various municipalities, *id.* at 154–58, 60 S.Ct. at 147–149, in part on the ground that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in *some other place*." *Id.* at 163, 60 S.Ct. at 151 (emphasis added). On this record, we cannot say that the Commission's decision directed NBUF to "some other place."

28. District Court opinion, 494 F.Supp. at 757.

29. The record contains allegations that the United Ways are "controlled by the larger char-

ities and the larger, more conservative donors" who are biased both against new charities and against organizations seeking to serve the black community. *See, e.g.,* J.A. 88, 121, 140. These contentions were not, however, undisputed. *See* note 30 *infra*. The district court did not purport to resolve these factual questions. *See* District Court opinion, 494 F.Supp. at 753, 757.

30. *See, e.g.,* J.A. 30–34, 56. For example, the plaintiffs in *United Black Fund v. Hampton*, 352 F.Supp. 898 (D.D.C.1972), *see* note 14 *supra*, now participate in the CFC through a special affiliation with the United Way of the National Capital Area. J.A. 34.

31. The district court found that the Commission's decision also violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)–(B) (1976), and the due process clause of the Fifth Amendment. Both of these determinations apparently derived from the court's conclusion that the denial of "national" status substantially inhibited NBUF's ability to conduct charitable solicitation at the federal workplace. *See* District Court opinion, 494 F.Supp. at 757–60 & n.14.

and the cause remanded for proceedings not inconsistent with this opinion.

*So ordered.*

Because we find the factual basis for that conclusion insufficient on this record, we need go no further in reviewing these holdings.